HENTSCHEL et al. v. BABY BATH-INETTE CORP. et al. (WHITE METAL ROLLING & STAMPING CORP., third party defendant).

No. 251, Docket 23021.

United States Court of Appeals, Second Circuit.

Argued April 8 & 9, 1954.

Decided July 27, 1954.

Frank, Circuit Judge, dissented.

Vine H. Smith, Brooklyn, N. Y., for plaintiffs-appellants.

Reilly, Dicker, McLouth & Lines, Rochester, N. Y., Stephen V. Lines, Rochester, N. Y., of counsel, for defendants-appellees, Baby Bathinette Corp. and Sears, Roebuck & Co.

George Berkowitz, New York City, for third party, defendant-appellee.

Before CHASE, Chief Judge, and SWAN and FRANK, Circuit Judges.

CHASE, Chief Judge.

The plaintiffs-appellants are a husband and wife who with their baby, and their other children, a boy five, and a girl three years old, were living in a four-room apartment in Muskegon, Mich., when a fire broke out in the bathroom on the morning of January 12, 1949. A baby bathinette which was then in the bathroom was ignited and its supports, made of a magnesium alloy known as MF, burned fiercely and were nearly consumed before the fire could be extinguished. The appellants and their children were in the apartment at the time and the danger to them, as well as to the apartment and its furnishings, was much increased by the burning magnesium alloy. They succeeded in getting the children safely out of the apartment but they were both injured in so doing.

The bathinette had been purchased by the appellant, Jerome Hentschel, from the appellee, Sears, Roebuck and Company about a year before the fire occurred and had been used in the apartment without mishap for the purpose for which that appellee had sold it; i. e., for bathing the baby. It had a waterproof plastic top to hold the water used for bathing and that top was supported by four legs crossed in X-shape made of magnesium alloy with wooden extensions. The magnesium alloy was composed of 96.83% magnesium; 1.39% aluminum; .96% manganese; and .82% zinc and silicon. The alloy was .049 of an inch thick and was extruded to make hollow pieces one inch square which were cut into lengths suitable to support the plastic top at the desired convenient height with the upper ends fastened to the top

The bathinette had been manufactured by the Baby Bathinette Corporation and sold to Sears, Roebuck and Company for resale. The hollow, square pieces of magnesium alloy from which the legs had been made had been purchased by the Baby Bathinette Corporation from the White Metal Rolling & Stamping Corp., which had manufactured and sold them for such use.

The appellants brought this suit, there being diversity jurisdiction, against the Baby Bathinette Corporation, Sears, Roebuck and Company, and Dow Chemical Corporation to recover damages for the personal injuries they had sustained. The complaint was dismissed as to the Dow Chemical Corporation for lack of jurisdiction and no issue survives as to that. The White Metal & Rolling Corp. was impleaded by the Baby Bathinette Corporation as a third party defendant. Negligence in constructing the bathinette of improper material was charged in the complaint as the cause of the fire and the resulting injuries to the plaintiffs, as

well as a breach of warranty to appellant Jerome Hentschel by the seller of it to him.

After a trial by jury, a verdict was returned for the defendants and this appeal is from the judgment on that verdict. The appellants rely for reversal upon asserted error in the charge and as to rulings during the trial admitting and excluding evidence.

The jury would have been justified in finding from the evidence substantially as follows:

What caused the fire to start in the bathroom was not proved. It was not, however, caused by the spontaneous combustion of any material of which the bathinette was constructed and the parts of that which were made of magnesium alloy began to burn only after one or more of them had been subjected to heat from some other source at a temperature of at least 1050–1100°F. When the magnesium alloy did get hot enough to burn the fire increased in intensity and was extremely difficult to extinguish with water since the use of water not in sufficient quantity to overwhelm such a fire will cause the release of inflammable hydrogen. This fire burned intensely and bursts of bluish flame shot out into the air to such an extent that Mrs. Hentschel received part of her burns from such bursts of flame when she was in her bedroom which was separated from the bathroom by a hallway.

The judge denied a motion by the defendants to dismiss the complaint when the evidence was closed and, without requests to charge, submitted the issues to the jury in a charge to which no exceptions were taken. That portion of the charge which the appellants now insist was erroneous was to the effect that there could be no recovery by either plaintiff on an implied warranty, or on the claim based on negligence, unless it was found that "this baby bathinette was the cause of the occurrence of the fire originally." It was made plain to the jury that if the fire was otherwise started and the bathinette was ignited because "it became subjected to flames from a previously started fire" there should be a verdict for the defendants.

Although there was no exception to the charge pursuant to Rule 51 F.R.C.P., 28 U.S.C.A., that does not necessarily preclude review on this appeal as we think there was no need to give the judge any opportunity to correct any inadvertent error. Sweeney v. United Features Syndicate, 2 Cir., 129 F.2d 904. He knew that one theory of recovery on which the plaintiffs relied was the asserted inherently dangerous character of the bathinette because of the intensity with which the magnesium alloy, of which it was in part constructed, would burn if it caught fire for any reason and evidently charged as he did with full appreciation of that.

In respect to the claim resting on the alleged negligence of the manufacturer, the general rule is that when the manufacturer of an article sells it ready for use and when used in the way the manufacturer intended to have it used it is an inherently dangerous instrumentality, the danger being unknown to the purchaser and not being patent upon reasonable inspection or disclosed to him, the manufacturer is liable to one who is personally injured while using it in the usual and intended manner. Coleman Co. v. Gray, 10 Cir., 192 F.2d 265; Reed & Barton Corporation v. Maas, 1 Cir., 73 F.2d 359; MacPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050, L.R.A. 1916F, 696; Noone v. Perlberg, Inc., 268 App.Div. 140, 49 N.Y.S.2d 460; Crist v. Art Metal Works, 230 App.Div. 114, 243 N.Y.S. 496, affirmed 255 N.Y. 624, 175 N.E. 341; Restatement, Torts, Sec. 388.

There was no evidence to show that this bathinette had any hidden defect which would make it unsafe for use in bathing a baby in the usual way or that in ordinary use it would come in contact with heat of from 1050–1100°F., or more, to cause it to catch fire. There was nothing about it which would create a fire and unless subjected to such a high temperature the magnesium alloy would not burn at all.

The cases cited above, upon which the appellants rely, are clearly distinguishable. In Coleman Co. v. Gray, Reed & Barton Corporation v. Maas, and MacPherson v. Buick Motor Co., the respective plaintiffs were injured when defective products were unable to stand up under normal and expected use. In Noone v. Perlberg, Inc., and Crist v. Art Metal Works the products were not defective in construction but were inherently dangerous when used in the normal way. Here the bathinette was in no way dangerous in normal use. It was only in situations of abnormality that it became dangerous; that is where it was exposed to extreme heat, and it would not reasonably be expected that a bathinette constructed in part of wood and plastic would be used where it would come into contact with heat of some 1100°F.

■■ It is quite true that in abnormal situations, which would subject the alloy to heat in excess of its ignition point, the bathinette would become dangerous. But the danger would be a relative matter. The magnesium would be more dangerous in a fire than wood or some other substances used in making bathinettes because of its higher burning temperature. But where an article is not inherently dangerous in its normal or intended use neither its manufacturer nor vendor is liable for a result which is brought about by its subjection to unusual and extraordinary conditions. Beickert v. G. M. Laboratories, 242 N.Y. 168, 151 N.E. 195.

■ The same conditions apply to the claim based on breach of warranty. There was, of course, an implied warranty that the bathinette was reasonably fit to be kept in a home for use in bathing a baby and was not a fire hazard in itself. But there was no warranty that it was non-combustible.

The questions relating to the admission and exclusion of evidence are not relevant to the decisive issue raised as to inherent danger as a result of the material used in constructing the magnesium leg frames and we find no prejudicial error in respect to them.

Affirmed.

FRANK, Circuit Judge (dissenting).

The question here is this: Ought the judge have allowed the jury to determine whether or not defendants should reasonably have foreseen that the thin sheets of magnesium, covering the legs of the bathinette, might be ignited, should a fire break out in the dwelling of a purchaser of the bathinette? My colleagues concede that such a fire might well lead such magnesium sheets to ignite and explode, and that the jury could rationally have found that just that did occur here, with serious damage to plaintiffs which would not have resulted from an ordinary fire, absent the magnesium sheets. But my colleagues hold, in effect, that here the judge correctly directed a verdict for the defendants with respect to this issue, because the occurrence of a household fire is so "abnormal" as not to be reasonably foreseeable by defendants.

The accident happened in Michigan, but the case was tried in New York. As, in such a case, the New York courts apply the Michigan rule,[1] so must we, since here federal jurisdiction rested on diversity of citizenship. The courts in both those states hold, in effect, that in negligence cases, "cause" consists of two components: Defendant's conduct must (1) in fact have caused (i. e., contributed to) plaintiff's injury, and also (2) be of the kind to which—as a matter of policy—the courts attach liability. Here (1) is indisputable (as my colleagues' opinion shows). (1), however, is a necessary but not a sufficient basis of liability. To meet (2), there must be evidence from which a jury may rationally find that the plaintiffs' injuries were not an improbable or unlikely result of defendants' conduct, but " 'one of those consequences' " —to quote Judge Learned Hand—" 'not entirely outside the range of expectation or probability, as ordinary men view

1. Loucks v. Standard Oil Co., 224 N.Y. 99, 120 N.E. 198.

·it'." [2] "The test is not of the balance of ·probabilities, but of the existence of some probability of sufficient moment to induce action to avoid it on the part of a reasonable mind." [3]

While the problem is often—perhaps usually—analyzed in terms of cause, an alternative and perhaps preferable analysis would be phrased in terms of duty. The ultimate inquiry would remain the same, although it would be phrased somewhat differently: Was the occurrence here foreseeable enough that it should be regarded as a risk which would make defendant's conduct negligent? If it was, then defendant owed a duty of reasonable care to protect against this hazard, and this duty he owed to those likely to be hurt, if the occurrence took place—and this undoubtedly included plaintiffs here. In this view, the only question of "cause" would be that of cause in fact. The happening of the fire would be regarded not as bearing on the issue of cause, but on the issue of negligence. This analysis

would still call for considering whether the event was likely enough "to induce action to avoid it on the part of a reasonable mind." [4]

The breaking out of a fire in a household is surely not improbable, unlikely, or unforeseeable. Millions of Americans so recognize, since fire insurance represents the commonest form of insurance; virtually all persons insure their goods against that sort of hazard; and well they might, since there are about a million fires each year in this country.[5] I fail to understand how this court can describe as "abnormal," unforeseeable, or unlikely, a happening which the numerous holders of fire policies plainly consider foreseeable.

When, after a defendant has acted, an "unexpectable" event "intervenes" [6] and contributes to plaintiff's harm, defendant's act is held non-culpable (being then sometimes labeled as not a "proximate cause").[7] But the courts everywhere

2. The Mars, D.C.S.D.N.Y., 9 F.2d 183, 184.
   We quoted that statement with approval in Pease v. Sinclair Refining Co., 2 Cir., 104 F.2d 183, 186.

3. Tullgren v. Amoskeag Mfg. Co., 82 N.H. 268, 276, 133 A. 4, 8, 46 A.L.R. 380, also quoted by us with approval in Pease v. Sinclair Refining Co., 2 Cir., 104 F.2d 183, 186. See also Gulf Refining Co. v. Williams, 183 Miss. 723, 185 So. 234, 236.

4. See, e. g., James, Scope of Duty in Negligence Cases, 47 Northwestern L.Rev. (1953) 778; Harper, Foreseeability Factor in the Law of Torts, 7 Notre Dame Lawyer (1932) 468; Seavy, Mr. Justice Cardozo and the Law of Torts, 52 Harv. L.Rev. (1939) 372. See also the following unsigned articles by Holmes: Codes and the Arrangement of the Law, 5 Am.L.R. (1870) 1, 3–4; The Arrangement of the Law (1872) 46; The Theory of Torts, 7 Am.L.R. (1873) 652, 660.

5. National Board of Fire Underwriters, Committee on Statistics, and Origins of Fires, Report May 1953, p. 10.

6. "It must be conceded that 'intervening force' is a highly unsatisfactory term, since we are dealing with a problem of responsibility, and not of physics"; Prosser, Torts (1941) 353.

7. No foggier phrase than "proximate cause" could be contrived for use in negligence cases. See, e. g., Gregory, Proximate Cause in Negligence—A Retreat From "Rationalization," 6 U. of Chi.L. Rev. (1938) 36; Pease v. Sinclair Refining Co., 2 Cir., 104 F.2d 183, 185; Edgerton, Legal Cause, 72 U. of Pa.L.Rev. (1924) 211; James and Perry, Legal Cause, 60 Yale L.J. (1951) 761; 1 Street, Foundations of Legal Liability (1906) 110, 112; Leon Green, Rationale of Proximate Cause (1927); Leon Green, Judge and Jury (1930) 196 ff, 242.
   In 1870, Nicholas St. John Green published a brilliant unsigned article, Proximate and Remote Cause, 4 Am.L.Rev. 201, later (after his death) reprinted in Green, Essays on Tort and Crime (1933) 1. There he showed that Lord Bacon's maxim, "In jure non remota causa, sed proximata, spectatur," derived from the schoolmen who in turn derived it from Aristotle. According to the schoolmen, so Green explained, (1) a "proximate cause" is one in which is involved the idea of necessity, one the connection between which and the effect is plain and intelligible, while (2) a "remote cause" is one which is inconclusive in reasoning, a cause the connection between which and the effect is uncertain, vague, or indeterminate, so that it does not contain in

itself the element of necessity between it and its effect. "The remote cause being given, the effect may or may not follow * * * [T]rue knowledge is knowledge of the proximate cause." A schoolman's textbook on logic, used at Oxford and Cambridge in Bacon's time, said that parents are the proximate cause of their children, but a grandfather is "the remote cause of his grandson. * * * A father depends upon his ancestors in begetting his son, and in this way every proximate cause upon the remote." Green noted that from the schoolmen we get the compound word "because," which is a contraction of the phrase "By the cause."

Green wrote: "Bearing in mind the disrepute into which the schoolmen fell, it is not perhaps surprising that when several generations after Bacon's time his maxim began to be gradually quoted in the court, its true meaning, as the enunciation of a general truth, should have been lost sight of. Confusion has resulted from regarding it, not as a general caution, but as a precept susceptible of a special application. It has been used in this manner more frequently in this country than in England. Some American courts seem to have regarded it as particularly applicable to cases of negligence, and in actions of that description have looked upon it as a rule placed in their hands for the purpose of measuring the facts, and saving the jury from trouble. * * * There is but one view of causation which can be of practical service. To every event there are certain antecedents, never a single antecedent, but always a set of antecedents, which being given the effect is sure to follow, unless some new thing intervenes to frustrate such result. It is not any one of this set of antecedents taken by itself which is the cause. No one by itself would produce the effect. The true cause is the whole set of antecedents taken together. Sometimes also it becomes necessary to take into account, as a part of the set of antecedents, the fact that nothing intervened to prevent the antecedents from being followed by the effect. But when a cause is to be investigated for any practical purpose the antecedent which is within the scope of that purpose is singled out and called the cause, to the neglect of the antecedents which are of no importance to the matter in hand. * * * What one of the various circumstances necessary to a death we shall single out as the cause, to the neglect of the other circumstances, depends upon the question for what purpose we are investigating the death. For each different purpose with which we investigate we

shall find a different circumstance, which we shall then intelligibly and properly call the cause. * * * From every point of view from which we look at the facts, a new cause appears. In as many different ways as we view an effect, so many different causes, as the word is generally used, can we find for it. The true, the entire, cause is none of these separate causes taken singly, but all of them taken together. These separate causes are not causes which stand to each other in the relation of proximate and remote, in any intelligible sense in which those words can be used."

With respect to the legal use of the maxim about "proximate cause," Green sagely remarked: "The chief difficulty * * * is that the term proximate and the term remote have no clear, distinct, and definable significations. Sometimes, causes are decided to be proximate which are remote in time; sometimes those are decided to be proximate which are remote in space. The division is neither scientific nor logical. It is not the scholastic division, though it often has many of its characteristics. Above all, it is not a fixed and constant division. It varies in different classes of actions. The same cause and effect which would be considered proximate in one class of actions, the attendant circumstances being unchanged, would be considered remote in others. The meaning of the terms, proximate and remote, is contracted or enlarged, according to what is the subject-matter of the inquiry."

Green went on to observe that the maxim is not used similarly in respect of contracts, insurance policies and negligence, and added: "In actions for negligence, a defendant is held liable for the natural and probable consequences of his misconduct. In this class of actions his misconduct is called the proximate cause of those results which a prudent foresight might have avoided. It is called the remote cause of other results. * * * There is no settled rule for the application of the maxim in determining the damages in actions of tort. In such actions, the damages, which are called proximate, often vary in proportion to the misconduct, recklessness or wantonness of the defendant. * * * The law makes us responsible for those effects of voluntary acts which might reasonably have been foreseen, or which are of a kind analogous to effects which might thus have been foreseen. *There is generally no other way of determining whether events analogous to them in kind, were or might have been anticipated or foreseen, than by an appeal to*

now hold that a defendant is not insulated from liability by the mere fact that there intervened even a tortious or criminal act of a third person or a "force of

*experience.* By applying this maxim, we make that appeal. We determine whether given causes and effects are proximate or remote, in the legal sense of those words, *from our own experience* of the succession of cause and effect. The use of the maxim is liable to lead to error by withdrawing the attention from the true subject of inquiry. We cannot add clearness to our reasoning by talking about proximate and remote causes and effects, when we mean only the degree of certainty or uncertainty with which the connection between cause and effect might have been anticipated. But this is an inconvenience which must be submitted to by those who attempt to make a practical application of the maxim." (Emphasis added.)

A portion of Green's unsigned article was quoted in Laidlaw v. Sage, 158 N.Y. 73, 99–100, 52 N.E. 679, 44 L.R.A. 216, and in Salsedo v. Palmer, 2 Cir., 278 F. 92, 96. As to Green's brilliance and originality, see 1 Street, Foundations of Legal Liability (1906) 273 note 2.

It should be of considerable interest to lawyers that Green, Oliver Wendell Holmes, Jr., and two other law-school graduates, John Fiske and Joseph B. Warner, as young men, were members of a "Metaphysical Club," together with the philosophers, C. S. Peirce and William James, and the scientist Chauncy Wright. See Wiener, Evolution and the Founders of Pragmatism (1949). Peirce, the author of the idea of "pragmatism," later acknowledged that he owed much of the idea to Green. He said of Green, "His extraordinary power of disrobing warm and breathing truths of the draperies of long-worn formulas, was what attracted attention to him everywhere." See Fisch, Alexander Bain and The Genealogy of Pragmatism, 15 J. of History of Ideas (1954) 413. See also Paul Weiss, *C. S. Peirce,* 14 Dictionary of Biography (1934) 394, 400; Patterson, Jurisprudence (1953) 471, 474–477; and Peirce's definition of proximate cause, in Baldwin's Dictionary of Philosophy and Psychology, some 30 years after Green's article.

It does not lack significance that, in 1927, Mr. Justice Holmes said that, as a young man, he had learned much from Green. See Fisch, loc. cit. at 414 note 6. Holmes may well thus have learned to emphasize "experience" as the "life of the law". See Holmes, The Common Law (1881) 1. His statement concerning negligence (Ibid. 149), "that experience is the test by which it is decided whether the degree of danger attending given conduct under certain known circumstances is sufficient to throw the risk upon the party pursuing it", seems an echo of Green's earlier statement (quoted above) about the "appeal to experience" in judicial determinations of foreseeability. See also Holmes, The Common Law (1880) 56, 147, 150, 152, 158, 162.

In the above quotations from Green's article, the emphasis on the effects of particular purposes in inquiries as to "cause," reveals the "pragmatist's" approach, and anticipates, by many years, the similar views on "cause" of Cardozo, Edgerton, M. R. Cohen and F. S. Cohen. See Cardozo, Paradoxes of Legal Science (1928) 83–85; Edgerton, Legal Cause, 72 U. of Pa.L.Rev. (1924) 211, 343; M. R. Cohen, The Meaning of Human History (1947) 96–97, 105–106, 113–115; F. S. Cohen, Field Theory and Judicial Logic, 59 Yale L.J. (1950) 251–259.

Although not noted by Green, Aristotle had asserted the reality of chance. Peirce did the same. See, e. g., Munkman, Causes of an Accidental Occurrence, 17 Modern L.Rev. (1954) 134; Frank, Fate and Freedom (1945) Chapter 12 and also pp. 95, 311 note 4, 323 note 29, 325 note 33, 361 note 19. Many modern physicists have abandoned the concept of determinism (absolute causality). See, e. g., Schroedinger, Science and the Human Temperament (1935); Frank, Fate and Freedom (1945) Chapter 12; Kelsen, Causality and Retribution, 8 Phil. of Sc. (1941) 533, 555–556.

That the scientific and philosophic notions of "cause" originally came from the usages of the Greek law courts, where "cause" denoted responsibility or guilt, see Johnson & Co. v. Securities & Exchange Commission, 2 Cir., 198 F.2d 690, 697 note 17; Jaeger, Paideia, Vol. I (1939) 159; Kelsen, Nature and Society (1943) 248, 263, 279, n. 97; Myres, The Beginning of Science, in the volume Science and Civilization (1923, Marvin ed.) 7, 21–22.

Related is the carry over (in early Greek thought, long before the Stoics) of the idea of a moral (just) social human order (with the notion of inexorable retribution at its core) to the realm of physical (nonhuman) nature, so that the idea of "laws of nature" originally stemmed from that of "natural law". See, e. g., Harrison, Themis (1911); Cornford, From Religion to Philosophy (1912); Frank, Fate and Freedom (1945) Chapter 10; Kelsen, Causality and Retribution, 8 Phil. of Science (1941) 533."

nature," [8] provided only the intervening factor was not within the category of the markedly unusual.

Typically, the highest Michigan court, in Brackins v. Olympia, Inc., 1946, 316 Mich. 275, 25 N.W.2d 197, 200, 168 A.L. R. 890, quoted with approval § 439 of the Restatement of Torts to that effect, and also the statement in 38 American Jurisprudence 716 that " 'one is liable to respond in damages for an injury which was the natural and probable result of the concurrence of his negligence with the negligence of another, or with an act of God or pure accident, or with an inanimate cause, notwithstanding his lack of responsibility for the other cause'." See also Restatement of Torts § 302 and comment g. It suffices, then, that the defendant creates "a situation harmless in itself but which will become actually and unreasonably dangerous as a result" of a "foreseeable intervening" event.[9] In line with this judicial attitude towards actionable negligence, the courts have often held that intervening "natural forces," such as lightning, wind, floods or drought, may be taken into account by a jury in ascertaining the foreseeable consequences of a negligent act.[10]

---

**8.** Restatement of Torts, §§ 290(b) and Comment d, 302 and Comment e, 447, 448, 449.

**9.** Eldredge, Modern Tort Problems (1941) 108.

Eldredge was the "revision Reporter" of the pertinent parts of the Restatement of Torts as revised in 1948. See Restatement of The Law, 1948 Supplement, p. viii; for revised sections, see, e. g., § 281, Comment ee, § 433(b) and Comment, § 435 and Comment d.

The "foreseeable" formula (as a substitute for "proximate cause") has also come in for criticism because of its lack of precision. See, e. g., Gregory, "Proximate Cause in Negligence—A Retreat From 'Rationalization,'" 6 Un. of Chi.L. Rev. (1938) 36 at 51–52; James and Ferry, Legal Cause, 60 Yale (1951) Law J. 762, 799–801; Restatement of Torts, 1948 Supplement, pp. 651–652.

Leon Green, Judge and Jury (1930) 202–203, writes: "The courts attempt to use the foreseeability, or the natural and probable consequence test—a supposedly proximate cause formula—in both civil and criminal cases. This formula, for use elsewhere than as part of the technic for submitting a question of negligence to a jury, would be beneath honest discussion were it not taken so seriously by many courts. It seems to be overlooked by those who put great faith in this formula that 'proximateness' as a test of liability becomes, in turn, a major subject for determination. To determine 'proximateness,' therefore, we must have 'probability.' But 'probability' itself must be determined, hence we employ 'foreseeability' for that purpose. But 'foreseeability' also must be determined, so we introduce the 'ordinary prudent person.' But he must be defined and oriented by the 'circumstances of the particular case' before he can do his work. Thus each test must in turn have its own test until the question to be decided becomes completely obscured. Nothing more is done under this formula, as used at this point, than to state in the crudest fashion the question of responsibility or no responsibility. It is a very poor way of saying that somebody must pass judgment on the case. Whoever that somebody may be, trial court, jury, or appellate court, he will 'foresee' as far as, and no further than, his own intelligence permits him. But this constantly expanding extravagant rigamarole about proximate cause and probable consequences has apparently so ensnared most judges that they have surrendered their independent power of judgment to it, in so far as that can be done while still leaving them able to reach a decision in the particular case. It is true that, under enlightened use, this formula need not get in the way, as it can be stretched to cover any end desired; but, on the other hand, it is subject to much abuse and may divert attention so widely from the problem involved that it has become one of the most hurtful influences in tort law. Both its vice and its virtue lie in the fact that it may count for anything or for nothing. Its function is similar to that of a joker in the game of poker."

Leon Green, in the same volume (144, 150, 244) also speaks of "ready to wear formulas"; of a "vocabulary of absorbent phrases which defy analysis"; and of "the thick mists of * * * terminology" which "are hard to penetrate."

**10.** Brown v. West Riverside Coal Co., 143 Iowa 662, 120 N.W. 732, 28 L.R.A.,N.S., 1260 (deceased killed when dynamite caps stored in workman's shanty were exploded by lightning); Milwaukee & St. P. R. Co. v. Kellogg, 94 U.S. 469, 24 L.Ed.

See, e. g., Johnson v. Kosmos Portland Cement Co., 6 Cir., 64 F.2d 193, 196. There plaintiff's decedent was engaged in making alterations on defendant's barge; defendant had previously used the barge for transporting oil but had failed to clean out the hold to prevent the generation of gases; the barge was struck by lightning, and an explosion of the gases resulted, as a consequence of which decedent was killed. The court held defendant liable, saying that lightning is "no extraordinary manifestation of natural force. Lightning strikes, and injury results. This is within our ordinary experience and observation. We take many precautions to avoid its injurious effect, insure and are insured against it. Nor is reasonable expectation of injurious consequences to be determined by the fact that no similar injurious result has been known to follow a like wrongful act under identical attending circumstances. If this were so, peculiar circumstances could be discovered in almost every accident, and relied upon to defeat liability. * * * It needs no illustration to demonstrate that danger may be present although injury has not yet occurred. Finally, to give validity to such contention would lead to the anomalous result noted in Texas & P. R. Co. v. Carlin, 5 Cir., 111 F. 777, 781, 'That for the first, and perhaps the second, injury occurring in such manner there could be no recovery; but for the third, or when the circumstances ceased to be peculiar or became familiar, the defendant would be liable.' We think, however, that the doctrine of foreseeable results calls for no such narrow test to be applied to anticipation of injury as the one above discussed. We think the true rule to be that when the thing done produces immediate danger of injury, and is a substantial factor in bringing it about, it is not necessary that the author of it should have had in mind the particular means by which the potential force he has created might be vitalized into injury." See Restatement of Torts, § 435: "If the actor's conduct is a substantial factor in bringing about harm to another, the fact that the actor neither foresaw nor should have foreseen the extent of the harm or the manner in which it occurred does not

256 (unusually strong winds carried sparks from defendant's ship to plaintiff's mill and lumber pile); Morrison v. City of Ironwood, 189 Mich. 117, 155 N.W. 477 (plaintiff injured by slipping into a ditch covered by snow from a recent and unexpected snowstorm); Vyse v. Chicago, B. & Q. R. Co., 126 Iowa 90, 101 N.W. 736 (crushed rock used to support foundations of railroad bridge diverted flood waters onto plaintiff's land); Anderson v. Minneapolis, St. P. & S. S. M. R. Co., 146 Minn. 430, 179 N.W. 45 (sparks from locomotive set bog afire and fire spread to plaintiff's house); Kennedy v. Union Electric Co. of Missouri, 358 Mo. 504, 216 S.W.2d 756 (siltage caused by maintenance of a dam plus heavy rainfall caused water damage to plaintiff's property); Kell v. Jansen, 53 Cal.App.2d 498, 127 P.2d 1033 (miner negligently allowed mining debris to block plaintiff's dam, ditch and bridge; subsequent flood carried debris against the bridge and ruined it); Inland Power & Light Co. v. Grieger, 9 Cir., 91 F.2d 811 (Power Company negligently released water from dam, thus raising flood crest and injuring plaintiff's property); Bushnell v. Telluride Power Co., 10 Cir., 145 F.2d 950 (fire spread by high winds); American Coal Co. v. De Wese, 4 Cir., 30 F.2d 349 (defendant negligently piled coal waste in a natural watercourse which filled with water during a heavy rainstorm; water and waste backed up and slid down on plaintiff's house burying seven people); Whitaker v. Pitcairn, 351 Mo. 848, 174 S.W.2d 163 (excessive rain caused washout of rail ballast and derailment of a train); Ford v. Wabash R. Co., 318 Mo. 723, 300 S.W. 2d 769 (unprecedented rainfall flooded railway station baggage depot and ruined plaintiff's luggage and its contents); Brewer v. United States, D.C.M.D.Ga., 108 F.Supp. 889 (whirlwind uprooted lifeguard's sun umbrella and drove umbrella's steel wire into the head of a visitor at the beach); Shephard v. Graham Bell Aviation Service, Inc., 56 N.M. 293, 243 P.2d 603 (airplane torn loose from a negligently tied single mooring by a gale wind); Charvoz v. Bonneville Irr. Dist., Utah, 235 P.2d 780 (land damaged by giving way of a negligently maintained canal during a heavy rainstorm); Public Service Co. v. Sonnagerra, 208 Okl. 95, 253 P.2d 169 (plaintiff injured by a sagging power line which was weighed down by sleet).

prevent him from being liable." [11]  See also Pease v. Sinclair Refining Co., 2 Cir., 104 F.2d 183, 185–186; Hogan v. Comac Sales, Inc., 245 App.Div. 216, 219, 281 N.Y.S. 207, affirmed 271 N.Y. 562, 2 N.E. 2d 695.

If, as a matter of policy, lightning is a foreseeable "intervening cause," [12] obviously a household fire cannot be less so. It does not constitute so unusual an intervention that "the court's sense of justice will be shocked at the thought of asking the defendant to respond for the injury" [13] and that it will therefore, in such a case, direct a verdict for him.

My colleagues say there was no evidence that "in ordinary use"—"in the way defendants intended to have it used" —the bathinette would come in contact with enough heat "to cause it to catch fire." But a bathinette's "ordinary" use is in a dwelling like plaintiff's. Such a use is not exceptional, unusual. Patently, defendants intended that use. A jury could reasonably conclude that defendants should have anticipated, as not at all unlikely, the breaking out of a fire in such a dwelling while the bathinette was in "ordinary use," and that defendants knew (or should have known) that *the presence of the bathinette could easily transform an ordinary house or apartment into a fire-trap.* For, as my colleagues admit, "the magnesium would be more dangerous in a fire than would wood or some other substances used in making bathinettes, because of its higher burning temperature" and "the intensity with

which" it "would burn if it caught fire for any reason."

On such facts, the defendants would owe a duty to warn a purchaser of this dangerous attribute of the magnesium. Restatement of Torts, § 388(c) and Comment g. [14]  Defendants gave no such warning. Instead, the bathinette was described in the Sears Roebuck catalogue as "practically indestructible." [15]  Absent an appropriate warning, the sale of the bathinette was "an act fraught with foreseeable peril" [16] to the purchaser and to anyone else (like the wife here) who might be expected to be present in the purchaser's dwelling when a fire occurred.

To comprehend the nature of defendants' negligence, one has but to ask whether defendant could have sold their bathinettes, if there had been affixed an easily-readable notice saying, "If a fire happens in your home, this bathinette will probably increase the dangers greatly, because the magnesium may ignite, causing unusual spurts of flame which will be peculiarly difficult to extinguish."

My colleagues say that liability turns on whether or not the bathinette was "inherently dangerous." But, as a leading commentator remarks, "It is difficult to understand why a number of courts still cling to the distinction between 'inherently dangerous articles' and other articles in discussing the liability of both manufacturers and vendors. Professor Bohlen and Judge Cardozo [in MacPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050, L.R.A.1916F, 696] long ago

---

11. The term "substantial," in this context, has been criticized for its ambiguity.

12. In Jackson v. Wisconsin Tel. Co., 1894, 88 Wis. 243, 253, 60 N.W. 430, 432, 26 L.R.A. 101, the court said: "The further argument is made that the stroke of lightning was the 'act of God,' for which no one is responsible. Certainly a stroke of lightning is an 'act of God;' but that is not the question here presented, or rather another element—i. e. the negligence of man—is added to the question, which materially alters its scope."

13. Eldredge, loc. cit., 224.

14. The duty of a manufacturer or vendor to give such warning has been analogized to the duty of the possessor of land to warn business visitors of latent dangers. See Prosser, Torts (1941) 677.

15. In this respect, the instant case is like Crist v. Art Metal Works, 230 App.Div. 114, 243 N.Y.S. 496, affirmed 255 N.Y. 624, 175 N.E. 341, cited by my colleagues, where the plaintiff recovered.

16. Eldredge, loc. cit., 247.

showed the fallacy of it. * * * " [17] So, too, typically, does one of the cases my colleagues cite.[18]

Today, in this legal province of negligence, considerations of social welfare, or "social value," [19] do (and should) affect the decisions as to a defendant's liability or the duty he owes to a plaintiff. Can anyone really believe—or think the Michigan Supreme Court believes—that it will promote an important "social value" to protect, from liability to purchasers, the makers and sellers of an article which, in case of fire, will create a hazard far greater than would otherwise exist, a hazard of which they are (or should be) aware but of which the purchasing householders are kept ignorant? What sound social policy inheres in such a rule? Yet, if my colleagues' ruling becomes a precedent, manufacturers and vendors who, for instance, make and sell, without warning, weather-stripping for windows (or weights attached to carpets) composed of thin magnesium strips, will be immune from successful suits against them, even if, in a fire, men, women or children burn to death because those strips produce the sort of intense flame the plaintiffs here encountered. Or consider a wall-paint containing a substance which, in a conflagration, will release poisonous fumes. My colleagues' ruling will tend to encourage the vending of such commodities perilous to human lives. The social interest [20] in the free trade of goods, the need to avoid legal rules tending unduly to paralyze business initiative, and the fostering of a legitimate profit motive, do not extend that far.

My colleagues cite no Michigan case. The cases they cite do not support their position. In Coleman v. Gray, 10 Cir., 192 F.2d 265, 268, the court held that the evidence justified a jury verdict for a plaintiff injured by a defect in an iron

17. Eldredge, loc. cit., 247. He cites, in addition to MacPherson v. Buick Motor Co., Bohlen, Studies in The Law of Torts (1926) 109, 131–137, and Ebbert v. Philadelphia Electric Co., 330 Pa. 257, 198 A. 323. See also Prosser, Torts (1941) 678.

18. Reed & Barton Corp. v. Maas, 1 Cir., 73 F.2d 359, 361.

19. See Restatement of Torts, § 292; James, Nature of Negligence, 3 Utah L. Rev. (1953) 275, 283–287; Conway v. O'Brien, 2 Cir., 111 F.2d 611, 612.

20. See Restatement of Torts, §§ 283 Comment c, 292a (and Comment a), 293a, 294; cf. Ch. 35, Introductory Note, Vo. 3 of Restatement of Torts, pp. 537–538.

Those and other portions of the Restatement adopt a theory of the balancing of competing "social interests," a theory developed by Bentham, Jhering, Geny, the German "jurisprudence-of-interests" school, Holmes, Cardozo, and Roscoe Pound. See, e. g., Friedmann, Legal Theory (3d ed. 1953), 228–244; The Science of Legal Method (1917) 38, 102–103, 123, 131; The Jurisprudence of Interests (transl. 1948); Holmes, Common Law (1881) 35–36, 95, 153, 154, 158; Holmes, The Path of The Law, 10 Harv.L.Rev. (1897) 457, Collected Legal Papers (1920) 167, 184; Holmes, Law In Science—Science In Law, 12 Harv.L.Rev. (1899) 443, Collected Legal Papers (1920) 210, 238–239, 242. For an excellent succinct exposition of this theory and its development, see Patterson, Jurisprudence (1953) 274, 283–284, 445, 459–464, 518–527.

Any precise "balancing" or "weighing" of such interests is impossible. See Patterson, supra, 526–527; Lepaulle, The Function of A Comparative Law, With A Critique of Sociological Jurisprudence, 35 Harv.L.Rev. (1922) 838, 844; M. R. Cohen, Reason and Law (1950) 96–97; cf. Lee, Social Values and The Philosophy of Law, 32 Va.L.Rev. (1946) 802, 812 ff; Conway v. O'Brien, 2 Cir., 111 F.2d 611, 612. See also Holmes, Law In Science—Science In Law, 12 Harv.L.Rev. (1899) 443, Collected Legal Papers (1920) 210, 231, 242.

As to the illusions bred by the metaphorical notion of "weighing" imponderables, see Larson v. Jo Ann Cab Corp., 2 Cir., 209 F.2d 929.

However, as Patterson suggests (supra, 522, 527, cf. 274, 282–284), the judicial articulation of "policy-weighing" and "balancing of interests" does serve to make the courts more reflective in contriving, revising and applying legal rules. See also Holmes, The Path of The Law, 10 Harv.L.Rev. (1897) 457, Collected Legal Papers (1920) 167, 184–185; Holmes, Law In Science—Science In Law, 12 Harv.L.Rev. (1899) 443, Collected Legal Papers (1920) 210, 238–239, 242.

when escaping vapor ignited and burned her. In Reed & Barton Corporation v. Maas, 1 Cir., 73 F.2d 359, 361, as already noted, the court, in sustaining a verdict for plaintiff, rejected the "inherently dangerous" terminology. In Crist v. Art Metal Works, 230 App.Div. 114, 243 N.Y. S. 496, 499, affirmed 255 N.Y. 624, 175 N.E. 341, the defendant, a manufacturer of toy revolvers who advertised them as "absolutely harmless," was held liable because the flame from such a revolver ignited a Santa Claus costume in which the infant plaintiff was dressed. The Court said that the defendant must be deemed to have known that children during the Christmas season or at other times "would probably be garbed in inflammable material," and that therefore there was a proper case to go to the jury as to defendant's negligence.

In Beickert v. G. M. Laboratories, 242 N.Y. 168, 151 N.E. 195, the defendant, manufacturing motion-picture films, put unused scraps of inflammable films in a large container and burned them in a vacant lot. The plaintiff, an infant, set fire to some of the unburned scraps he found in the lot, and was injured. The court said 242 N.Y. at pages 174–175, 151 N.E. at page 196: "The facts in the instant case do not show that the result or cause of the accident could have been reasonably expected by the defendant. It had a right to burn the films in the vacant lot. It was not there storing such films. No person could reasonably be expected to foresee that while the films were being burned small pieces would be carried into the air and later settle upon the ground; that they would be picked up by small boys who had not been invited there, carried away, and then either by accident or design lighted. To hold defendant liable under such circumstances would be contrary to the great weight of judicial authority, and contrary to reason and common sense. * * * These results the defendant was not bound to anticipate." The court distinguished Travell v. Bannerman, 174 N.Y. 47, 66 N.E. 583, as follows: "There

it appeared that the defendant was the proprietor of a gun and ammunition factory and adjoining the factory was an unfenced lot, which was and for some time had been used as a playground by the plaintiff, and other small boys; that the defendant stored or placed in this lot a cake of gunpowder and a cannon primer; that one of the boys found the powder and primer and proceeded to extract the brass imbedded in it, and, in doing so, it exploded, and he was injured. Obviously, the defendant could not expose young children to such a risk. He knew the boys were in the habit of playing in this lot and he knew, or was bound to know, of the dangerous character of the material if force were applied to it."

In Noone v. Perlberg, 268 App.Div. 149, 49 N.Y.S.2d 460, the defendant manufactured an evening-gown with an overskirt containing nitro-cellulose sizing, of a highly inflammable character. Plaintiff, who bought the gown from a retailer, wore it at a New Year's Eve party in a club. While walking across the cocktail lounge of the club, her dress caught fire, flashed up in a blaze, and plaintiff was seriously burned. The trial court set aside a jury verdict in the plaintiff's favor and directed a verdict for the defendant. The upper court reversed with directions to enter judgment for plaintiff. Although there was no proof that the dress had come into contact with a lighted cigar or cigarette, the court said: "The manufacturer must or should have known that such an evening-gown would be worn to dinners and cocktail parties where large numbers of persons gather and many indulge in smoking."

Even were the New York decisions out of step with the rule generally prevailing elsewhere, they should not control the decision here. So my colleagues tacitly admit—by citing not only the Restatement but also cases arising in the First and Tenth Circuits.

In the light of the foregoing, I think the trial judge erred in charging the jury that they must find for defendants if the

bathinette ignited because "it became subjected to flames from a previously started fire." [21]

21. Defendants introduced expert testimony to show that "mf alloy" (i. e., the magnesium alloy used in the bathinette) is used extensively in fire ladders, airplane cowling, hot-water heaters, toy parts and griddles (the latter being sold with a cautionary label that magnesium griddles should not be subjected to heat higher than 900° Fahrenheit). The expert testimony indicated that "mf alloy" can be used with safety in areas subjected to heat. The testimony was, I think, quite irrelevant since the uses covered by this testimony involved alloys considerably thicker than the .049-inch-thick magnesium tubing used in the bathinette legs. The time necessary and the heat needed to bring magnesium to ignition will depend on the thickness and size of the metal piece exposed to heat. Because of its inability to conduct heat away from the point of concentration, thin sections of magnesium will ignite faster than heavy, solid sections. When the fire starts there is an evolution of additional heat from the oxidation of the metal, and the burning becomes continuous. "Magnesium, A Handbook," American Magnesium Corporation (1923) p. 107. See also Beck, The Technology of Magnesium and Its Alloys (1940) p. 119.

Defendants' experts admitted that "mf alloy" can be ignited at 1050°–1100° Fahrenheit but made no mention of the fact that "mf alloy" in very thin sheets might be ignited at a lower temperature. Nor did they indicate that while a heavy magnesium casting might only burn through at the point of contact, a thin magnesium extrusion once ignited would cause pyrotechnics as did the tubing in the baby bathinette.

Plaintiff did not object to admission of defendants' evidence as to the physical properties of magnesium in heavy sheets or castings, although such evidence was irrelevant and misleading. If there were a new trial, I think evidence concerning combustibility should be restricted to the properties of "mf alloy" in thin extrusions.

Plaintiff, Jerome Hentschel, was asked by his counsel to describe an experiment performed by a chemist to test the combustibility of a piece of magnesium tubing taken from the burned bathinette and to describe the results of that experiment. The judge sustained an objection on the ground that plaintiff was not qualified. I think this ruling was erroneous, since plaintiff was asked to relate only his observations. He need not have been a qualified chemist in order to state what he observed.