## LAFOURCHE PACKET CO. v. HENDERSON.

(Circuit Court of Appeals, Fifth Circuit. May 23, 1899.)

### No. 810.

1. APPEALS IN ADMIRALTY—ASSIGNMENTS OF ERROR.
   An assignment "that the court erred in holding that libelant was entitled to any compensation for the injuries received" by him is too general.

2. SHIPPING—INJURIES TO SEAMEN—LIABILITY OF SHIP.
   It seems that, under the general admiralty practice, a seaman injured through the use of defective appliances furnished by the owners of the ship may proceed against the ship for damages.

3. SAME—NEGLIGENCE—DEFECTIVE APPLIANCES.
   Where a skid used to stow barrels into the hold was broken on a prior voyage, to the knowledge of the ship's officers, so that, through the sagging of one side of it, a bolt worked up and caught a barrel being sent down, and threw it off and against a seaman engaged in the work, the ship was liable for the injuries inflicted.

4. SAME—ASSUMPTION OF RISK.
   A seaman does not assume the risk involved in the use, under orders, of patently defective appliances furnished him by the master.

5. SAME—DAMAGES—EXCESSIVENESS.
   Where both bones of the leg of a seaman were broken through negligence, and after the injury he was grossly neglected by the officers of the ship, and the injury was permanent and greatly damaged him in his earning capacity, damages of $2,000 were not excessive.

Appeal from the District Court of the United States for the Eastern District of Louisiana.

On or about March 8, 1898, William Henderson, appellee, was shipped at New Orleans, La., as a seaman in the service of the steamboat Lafourche, for a voyage to Thibodaux, La., in Bayou Lafourche, and return to New Orleans, at the wages of $80 per month and found. The boat made the outward trip with libelant in the service thereof. On the return trip, and while said vessel was lying at a plantation on Bayou Lafourche, the said Henderson, with others of the crew, was duly ordered to go into the hold or hull of said steamboat to aid and assist in storing cargo. Accordingly he proceeded to the place or part

of said hull or hold designated, and proceeded in the discharge of the duties required of him. While so occupied, and while cargo was being taken on board and stowed in the hull of said vessel, said Henderson was required by the proper officers of said vessel, and the duty assigned him, to stand by the lower end of the skid leading from the main deck down to the floor in the hull, so that, as barrels of sugar skated or "skidded" into the hold of said boat from the main deck would arrive at a point near, he could "cut" (turn) them around, for others of the crew engaged thereabout to roll them to the afterpart of the hull for storage. While said Henderson was performing the duties above mentioned, a barrel of sugar was placed on the skid and started on its way down. After this barrel had gotten about halfway down, and while traveling with great velocity, it turned around, and, instead of continuing down the skid, it rapidly rolled off over the side; and, before libelant could escape, his left leg was caught by the barrel against a stanchion, and both bones of the leg were broken. To the knowledge of the officers of said steamboat, acquired on a prior trip, one side of the skid was weak, one hook broken off, and the iron facing of the runner broken. After sustaining the injury complained of, libelant was carried up out of the hull, taken aft, and placed on some freight. A doctor came on board and professed to set the broken limb, which was then bandaged; and libelant was laid on some stuff spread on the boat's deck, made to answer the purpose of a mattress. Appellant was injured about 4 or 5 o'clock Wednesday afternoon, and from that time until Thursday night he was left on the boat's deck, as above mentioned. When the crew was paid off, his wages were sent down to him. After the trip was concluded, the crew soon left the boat, except libelant who was permitted to lie on the boat's deck in his helpless condition. Some hours after the arrival of the vessel in port, a harbor police officer came on board, and found appellee lying in a helpless condition on deck, ascertained from him the nature of his injury, and sent for the Charity wagon, which in due time arrived, and took appellee to the Charity Hospital. All these facts are undisputed. The opinion of the court deals with controverted matters. Because of the injuries sustained, the loss of wages, and the impaired capacity to earn wages, the physical pain, and the neglect of appellee after he was injured, he brought this libel in rem to recover the sum of $3,000. After a hearing of the case, and after a personal inspection of the skid causing appellee's injuries, the court rendered a decree in favor of the libelant for the sum of $2,000. On this appeal, the following are the assigned errors: "(1) That the court erred in holding that libelant was entitled to any compensation for the injuries received; (2) that the injuries complained of in the said libel were not caused by any fault or negligence on the part of the claimant, or any person for whom claimant was responsible; (3) that the defect, if existing at all, was a patent defect, and the risk assumed was one of the assumed risks of the employment, and was known to libelant; (4) that, even if libelant was entitled to any allowance whatever, the allowance granted herein is excessive."

Hewes T. Gurley, for appellant.

John D. Grace and A. B. Phillips, for appellee.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

After stating the facts, the opinion of the court was delivered by PARDEE, Circuit Judge.

The first assignment of error is too general to warrant attention, but it is the only one to cover the point sought to be raised,—that, while the district court, sitting in admiralty, had jurisdiction of the demand, yet the libelant had no right to proceed in rem, because he had no maritime lien on the ship, nor any lien under the domestic law for damages resulting from his personal injuries, as set forth in the libel. In the district and circuit courts in this circuit, it has never been seriously disputed that, under the general admiralty practice, a seaman who is injured through the use of defective appliances furnished by the owners of the ship has a right to proceed against

the ship to recover his damages. Several cases of the kind have been brought to this circuit court of appeals since its organization, and the jurisdiction to proceed in rem has been taken for granted. The Whisper, 2 U. S. App. 618, 4 C. C. A. 654, and 54 Fed. 896; Johnston v. Johansen, 30 C. C. A. 675, 86 Fed. 886. The right of other persons than regular seamen, employed on a ship, to proceed in rem to recover damages for personal injuries, has been tacitly recognized in all the courts of the United States, and has been affirmatively recognized in The Christobal Colon, 44 Fed. 803, decided in the Eastern district of Louisiana; and there may be other cases to the same effect. We know of none to the contrary. The precise question now presented is not necessarily raised on this appeal, because the domestic law gives the libelant a lien and privilege. The Lafourche was owned in Louisiana, and was running from New Orleans to various places through Louisiana waters; and the injuries complained of were suffered on Bayou Lafourche, in the state of Louisiana. Article 3237 of the Louisiana Revised Civil Code provides as follows:

"The following debts are privileged on the price of ships and other vessels, in the order in which they are placed: * * * (12) Where any loss or damage has been caused to the person or property of any individual by any carelessness, neglect or want of skill in the direction or management of any steamboat, barge, flatboat, water craft or raft, the party injured shall have a privilege to rank after the privileges above specified. * * *"

The second assignment raises the question whether the injuries to the libelant were caused by any negligence or fault on the part of the ship. As recited in the statement of facts, it is undisputed that the libelant received his injuries while in the line of his duty, and while using with his fellow servants a broken skid, and that the skid so used had for some time been broken, on or before a prior voyage, and its condition was known to the officers of the ship. The evidence of the libelant and his witnesses is to the effect that, through the sagging of one side of the skid on which side the hook was broken, a bolt worked up about the middle or belly of the skid, which caught the barrel then being sent down into the hold, cut one of the hoops, and otherwise threw it off the skid, resulting in the libelant's injury. John Williams, the witness who testified the clearest on this point, was the man who placed the barrels upon the skid, starting them down the hold. His evidence is so pointed that we extract as follows:

"Q. Do you know what the cause was of that barrel twisting around on that skid? A. When the barrel twisted around on the skid, and this man hollered, I went down in the hold to assist him; and when I went down in the hold to assist him I looked on the side of the skid, and I saw there was a bolt just about that high up,—that had risen up about an inch,—and the hoop of the barrel had struck it, and the hoop was cut plumb in two. Q. Was it proper for that bolt to be extending up over and above the side of the skid? A. No, sir. Q. What was the cause of the bolt extending up that way? A. The skid was broken one side. It had only one prong, whereas it should have had two. One was broke, and they were fixing the skid with a block,—working the skid with a block. It was put underneath the skid, and it would slip out, and that would make this bolt work up. Q. Whose duty was it to pay attention to those blocks? A. Most any that was in the hold. Q. What blocks were they? A. They were little, short blocks, put under the skid to keep it from sliding up. Q. Pieces of 'plunder,' they call it on the boat? A. Yes, sir. Q. You say this

bolt had worked up through there? A. Yes, sir. Q. To your mind, was the working up of the bolt the cause of the catching of this barrel and throwing the barrel off? (Objection is urged, being a matter of opinion.) A. Yes, sir. Q. Was there any other thing present, or the skid in any other condition, that could have brought about that result, except the fact that this skid was broken, and blocks put under it? A. The skid was broken on the side, and it was kept propped up with these blocks; and, when these blocks slipped out, it let the skid down, and that would make this bolt jump up. Q. Do you know whether a complaint was made to the carpenter about the condition of that skid? A. Yes, sir; I made it myself. Q. When? A. While the boat was coming down Bayou Lafourche. Q. What did you tell this carpenter? A.. I said that the skid ought to be fixed,—it was mighty dangerous,—and he told me it was none of my business. * * * Q. After Henderson got hurt, was any more barrels put down on that side? A. Yes, sir; I went down and shoved the block down underneath the skid, and took a long piece of iron and drove the bolt back; and the next man that took his place, cutting off the barrels, I told him to be particular of that block underneath, and whenever it got loose to let me know, and I would stop the work so that he could put it underneath again. * * * Q. They didn't put anybody down there to look after the blocks, then? A. No, sir. Q. I speak about this block underneath the skid. A. That was his business, but he didn't know it. No one didn't tell him about it. That was his first trip on the boat. He thought the skids were in proper shape. He didn't pay any attention to the blocks at all. Q. No one had warned him about the defective condition of the skid? A. No, sir. * * * Q. You said something awhile ago about a bolt that was in the skid,—about a catching on this hoop of the barrel and cutting it. Where was that bolt? (Objection is urged to this examination, nothing about which has been brought out on the cross-examination.) A. The swagging of the broken part— When the block would slip out, it would swag this way, and make the bolt rise up on the right-hand side. Q. About how far down the skid was this bolt? A. It was about middle ways. Q. Each side of the skid consists of several pieces of wood bolted together. Now, this bolt was one of the bolts that belonged to the skid? A. It was one of the bolts that held the band on the skid. Q. About how far down? About the belly of the skid? A. About middle ways of the skid. Q. You spoke about the hook being broken. That allowed the skid to swag? A. Yes, sir; and it made the bolt rise up. Q. And that made the bolt down in the belly of the skid work up? A. Yes, sir."

Williams' evidence is corroborated by his fellows, and is not disputed by facts testified to by any of the claimant's witnesses.

The contention of the appellants is that the libelant was injured through the negligence of a fellow servant in placing barrels on the skid, and that the broken hook of the skid cut no figure in the matter. This contention has no support in the evidence, because the persons who were engaged in placing the barrels on the skid directly deny it,—deny that any were improperly placed on the skid,—and there is no evidence whatever to show that the one barrel which injured the libelant was improperly placed upon the skid.

Some argument is made in the brief as to the character of libelant's witnesses, but, from an inspection of the record, we are unable to see that they were any less intelligent or more prejudiced than those witnesses offered by the claimant. The result, to our minds, on all the evidence, is the firm conviction that the libelant received his injuries through the use of the broken skid, which was an insufficient and defective, if not actually dangerous, appliance furnished by the ship.

Under the third assignment of error the appellant contends that if the skid was broken and defective, and the libelant was injured in using the same, still he cannot recover, because the defect was patent,

and he knew it, or ought to have known it, from contact with and observation of it, and in continuing to use the same he accepted the risk. The learned counsel, in a very strong brief, supports this contention by the citation of text-books and adjudged cases in the common-law courts,—particularly citing Bailey, Mast. Liab. pp. 198, 199; Way v. Railroad Co., 40 Iowa, 341; Sullivan v. Manufacturing Co., 113 Mass. 398; McGlynn v. Brodie, 31 Cal. 380; Hayden v. Manufacturing Co., 29 Conn. 548; Wormell v. Railroad Co., 79 Me. 405, 10 Atl. 52, in which last-mentioned case it is declared as follows:

"It is the duty of the servant to exercise care to avoid injuries to himself. He is under as great obligation to provide for his own safety from such damages as are known to him, or are discernible by ordinary care on his part, as the master is to provide for him. He must take ordinary care to learn the dangers which are likely to beset him in the service. He must not go blindly to his work where there is danger. He must inform himself. This is the law everywhere."

Without discussing or disputing the law as declared in the authorities mentioned, we are of opinion that it is not applicable to the case in hand. There must be a different rule as to the risks assumed by seamen on board ship from the rule as to the risks assumed by servants and other employés on land.

Curtis on the Rights and Duties of Merchant Seamen (page 11) says:

"The contract of hire for marine service belongs in general to the entire class of contracts for the hire of services, but it also involves, and is governed by, principles peculiar to itself, and which carry it, in very important particulars, beyond the rules applicable merely to contracts of service upon land. Thus, by the common law of England and of this country, when a man lets himself to hire, and neglects or refuses to fulfill his engagement, he cannot be compelled to perform it by any restraint put upon the freedom of his person. The remedy of the other party is solely in the damages he may recover for breach of the contract. The same principle prevails in the civil law ('nemo potest procise cogi ad factum'), and the same remedy only is afforded to the injured party. But by the law of most countries the mariner's contract is an exception to this general principle. By the French ordinance, the seaman who fails to render himself on board according to this contract can be pursued and arrested wherever he is found, and constrained to complete his engagement. The same provision for his apprehension and compulsion is made in England and in this country. There is also another peculiarity of this contract, in which it differs from other contracts for the hire of services. It is the only form of service stipulated to be rendered by a freeman of full age, known to the common law, in which the employer, by his own act, can directly inflict a punishment on the employed for neglect of duty or breach of obligation. By the positive law of some countries, also, and perhaps by the general law of the sea, the seamen are bound to assist, at the risk of their lives, in defending the ship against pirates; and a refusal to fight is punished criminally. Such is the law of France and of England. All these peculiarities of the contract are founded in deep reasons of policy and necessity; and, although they do not give a character to this service which takes it out of the general rules and principles applicable to the whole class of contracts for the hire of services, they are important to be stated at the outset, as the prominent features of distinction, reminding us that those general rules and principles will sometimes fall far short of satisfying the exigencies of a contract so strongly marked by principles of its own."

In Robertson v. Baldwin, 165 U. S. 275, 282, 17 Sup. Ct. 329, the supreme court say:

"From the earliest historical period the contract of the sailor has been treated as an exceptional one, and involving to a certain extent the surrender of his personal liberty during the life of the contract. Indeed, the business of navigation could scarcely be carried on without some guaranty, beyond the ordinary civil remedies upon contract, that the sailor will not desert the ship at a critical moment, or leave her at some place where seamen are impossible to be obtained, —as Molloy forcibly expresses it, 'to rot in her neglected brine.' Such desertion might involve a long delay of the vessel while the master is seeking another crew, an abandonment of the voyage, and in some cases the safety of the ship itself. Hence the laws of nearly all maritime nations have made provision for securing the personal attendance of the crew on board, and for their criminal punishment for desertion or absence without leave during the life of the shipping articles."

A seaman aboard ship is bound to perform such services as may be required of him in the line of his employment. He cannot hold back and refuse prompt obedience because he may deem the appliances faulty or unsafe. Masters of ships exercise large powers, and they may legally compel obedience to orders. A seaman necessarily surrenders much of his personal liberty and freedom of action, and he is never at liberty, like the landsman, to quit or make much objection to the circumstances surrounding the work commanded. In Johnson v. Johansen, supra, which was a case in many respects similar to the one in hand, in answer to the same objection as the one now made, this court said:

"It may be, as urged so strongly by the appellant, that the libelant received these appliances and proceeded to use them without objection; but, if this be so, it must be considered that on board ship a sailor is not expected to, nor, as for that matter, permitted, before executing an order, to question the propriety of the order, or the sufficiency of the materials furnished."

The remaining assignment of error is that the damages allowed by the district court are excessive. Considering the very serious injury received by the appellant, in the breaking of both bones in the leg, his physical suffering, and the neglect he received from the hands of the officers of the boat, and the undisputed fact that the libelant is permanently injured, and greatly damaged in his earning capacity, we are not disposed to disturb the amount allowed by the district court. No case is made for the division of damages because of contributory negligence. The decree appealed from is affirmed.