ZINNEL v. UNITED STATES SHIPPING BOARD EMERGENCY FLEET CORPORATION.

(Circuit Court of Appeals, Second Circuit. December 7, 1925.)

No. 102.

1. Evidence ⊝359(3)—Photograph of portion of ship, showing no lines along side where seaman was washed overboard, held admissible.

In action for death of seaman washed overboard, photograph taken shortly before accident, showing no line along side, *held* admissible to corroborate testimony that there was no such line shortly before or immediately after accident, and particularly to contradict testimony of master and mate that lines were kept standing through whole voyage, though correctness of photograph at instant of accident was not shown.

2. Seamen ⊝29(5)—Whether there were lines along port side, where seaman was washed overboard, held for jury.

In action for death, plaintiff *held* entitled to go to jury on question whether there were lines along port side, where seaman was washed overboard.

3. Seamen ⊝29(5)—Whether absence of line along port side was failure to exercise reasonable care to furnish safe place to work held for jury.

Whether absence of line along port side, where seaman was washed overboard while working on deck load of lumber carried on well deck, between bridge and forecastle head, was failure to exercise reasonable care to furnish safe place to work, *held* question for jury.

4. Seamen ⊝29(2)—Recovery for seaman, washed overboard when working on deck load of lumber, may be had, though ship seaworthy.

Under Jones Act 1920 (Comp. St. Ann. Supp. 1923, §§ 8146¼–8146¼t), incorporating Employers' Liability Act (Comp. St. §§ 8657–8665) by reference, when seaman was washed overboard, shipowner is liable for faulty use by crew of proper apparatus, though ship was seaworthy.

5. Seamen ⊝29(5)—Reasonable men might differ on question whether seaman would have been saved, if there had been rope along deck where he was washed off.

Question whether seaman, who was washed off ship, would have been saved if there had been rope along deck where he was washed off, *held* question about which reasonable men might differ.

6. Seamen ⊝29(4)—Seaman, working on deck load in obedience to orders, held not to assume risk from absence of guard rope.

Seaman, washed overboard while working on deck load of lumber in obedience to orders, did not assume risk arising from absence of guard rope.

Hough, Circuit Judge, dissenting in part.

In Error to the District Court of the United States for the Eastern District of New York.

Action by Henry Zinnel, administrator of Charles J. Zinnel, against the United States Shipping Board Emergency Fleet Corporation. Judgment dismissing complaint, and plaintiff brings error. Reversed, and new trial ordered.

Writ of error to a judgment dismissing a complaint in an action at law upon a directed verdict. The plaintiff is the administrator of his son, Charles J. Zinnel, who was employed as one of the crew of the defendant's ship, Eastern Sailor, on a voyage from the port of New York to Yokohama. During a storm the vessel shipped a sea on her starboard bow and swept the intestate overboard, where he drowned after ineffectual efforts to rescue him. The action was brought under the Jones Act of 1920 (Comp. St. Ann. Supp. 1923, §§ 8146¼–8146¼t), and the faults alleged were that the vessel was unseaworthy and that the defendant did not provide the intestate with a safe place to work. The answer, besides denials, pleaded that the intestate assumed the risk of the employment.

The Eastern Sailor, between the bridge or shelter deck and the forecastle head, had a "well deck," upon which she carried a deck load of lumber made fast by chain lashings. This load came above the rail or gunwale on the well deck and to the level of the forecastle head. Where the deck load was stowed there was therefore no rail or other protection at the side; the edge of the timber extending to the inner skin of the ship.

Heavy weather and seas shipped on board had raised some of the timber and loosened the lashings. It became necessary to the safety of the ship that the deck load should again be made fast, and the master directed

the intestate, with other members of the crew, to go forward and add new lashings under the direction of the boatswain. While seated upon the top of the deck load and nearly amidships, and engaged in passing a new lashing over the load, the vessel shipped a sea over her starboard bow, which carried the intestate over the port side of the ship and into the sea. The fault relied on below was the absence of a guard rope from the rail on the forecastle head leading aft on the port side to the shelter deck, which the intestate might have seized, or which in any case would have stopped his passage over the ship's side.

The master and chief mate testified that such lines had been maintained on either side, during the whole voyage, for the protection of the crew, and to steady them while crossing. On the other hand, the plaintiff produced a member of the crew, who swore that on the morning of the accident, a few hours before it took place, and immediately thereafter, there was no line along the port side. To corroborate this he presented a photograph, taken three or four days earlier, showing the port side forward without any such line.

The learned judge declined to receive the photograph, on the ground that it did not show the condition at the time of the accident. He dismissed the complaint, because the evidence too strongly preponderated in the defendant's favor to allow a verdict, and because the intestate, in working where he did and at such a time, assumed any risk due to the absence of the line.

Charles Warren Hastings, of New York City, for plaintiff in error.

Ralph C. Greene, U. S. Atty., of Brooklyn (Edgar G. Wandless and Joseph M. Dreyer, both of New York City, of counsel), for defendant in error.

Before HOUGH, HAND, and MACK, Circuit Judges.

HAND, Circuit Judge (after stating the facts as above). [1, 2] The refusal of the court to allow the photograph in evidence for the purpose offered was erroneous. It was not necessary that the witness who took it should swear that it was correct at the exact moment of the accident, when he was not present. If it represented the truth in the morning, a few hours before, and at once after the accident, the jury was entitled to assume that there had been no change in the interim. It was, moreover, admissible to contradict the testimony of the master and the mate that the lines were kept standing through the whole voyage, which it very effectually did. Not only was the plaintiff entitled to go to the jury upon the question whether the lines were standing at the time, assuming that to be relevant, but it is very hard to see how the jury could have reached a verdict for the defendant upon that issue. The learned judge was certainly in error in taking the case from the jury.

[3] The question of law remains, whether the absence of the line was a default in the defendant's duty to exercise reasonable care to furnish the decedent with a reasonably safe place to work. Upon this we might accept the testimony of the master and the mate themselves as sufficient evidence, for they swore that the lines were kept standing throughout the voyage, for the purpose of protecting seamen when passing across the deck load. Nor can we see how, in the absence of such proof, there can be much doubt about the necessity of some such guard. The deck load in effect raised the well deck to the level of the forecastle head, and left no protection of any sort. Without some guard line we need no expert to show us that a case was presented, which a jury must decide, as to the safety of the place where the intestate was ordered to work. Indeed, it seems to us hard to see how a jury could find for the defendant on this issue, as well as on the issue of the absence of the line.

[4] The cause arises in substance under the Employers' Liability Act (Comp. St. §§ 8657–8665), since that is incorporated by reference. It is therefore quite unnecessary to say that the ship was unseaworthy, at least in the ordinary sense, which makes the commencement of the voyage the test. The act has made applicable to work at sea the same rules which protect work on shore, and the shipowner is as liable for the faulty use by the crew of proper apparatus as though the ship were unseaworthy in equipment when she broke ground. This was in effect ruled in Panama R. R. v. Johnson, 264 U. S. 375, 44 S. Ct. 391, 68 L. Ed. 748, where one of the faults was in the negligent use of apparently sound equipment. We therefore decline to engage in any discussion as to seaworthiness, beyond, indeed, observing that the term has itself the most relative meaning (The Silvia, 171 U. S. 462, 464, 19 S. Ct. 7, 43 L. Ed. 241; The Southwark, 191 U. S. 1, 9, 24 S. Ct. 1, 48 L. Ed. 65), and that cases can arise where juries must pass upon it (Carlisle Packing Co. v. Sandanger, 259 U. S. 255, 259, 42 S. Ct. 475, 66 L. Ed. 927). All we need, and do, hold is that under the law of master and

servant, as now in force by statute, the circumstances were such as would allow the jury to find that there was no rope, and that its absence made the intestate's place of work unsafe.

[5] There of course remains the question whether they might have also said that the fault caused the loss. About that we agree no certain conclusion was possible. Nobody could, in the nature of things, be sure that the intestate would have seized the rope, or, if he had not, that it would have stopped his body. But we are not dealing with a criminal case, nor are we justified, where certainty is impossible, in insisting upon it. We cannot say that there was no likelihood that a rope three feet above the deck made by the timber would not have saved the seaman. In this connection we note that the ship did not take aboard green water, but that the bluff of the bow broke the force of the sea shipped, which, when it reached the deck load, was made up of white water, and was not big enough to lift up a man's body. Considering that such lines were run for the express purpose, among others, of protecting seamen, we think it a question about which reasonable men might at least differ whether the intestate would not have been saved, had it been there.

[6] As to the assumption of risk, on which we all agree, we need do no more than refer to our own decisions in Cricket S. S. Co. v. Parry (C. C. A.) 263 F. 523, and Panama R. R. Co. v. Johnson (C. C. A.) 289 F. 964, and to the law in other circuits, Lafourche Packet Co. v. Henderson, 94 F. 871, 36 C. C. A. 519 (C. C. A. 5), and The Colusa, 248 F. 21, 160 C. C. A. 161 (C. C. A. 9).

Judgment reversed, and new trial ordered.

HOUGH, Circuit Judge (dissenting in part). I agree with this opinion regarding the admission in evidence of the photograph and the effect of previous decisions of this court as to assumption of risk; but I cannot approve of the obvious intent of the majority to dump this case on a jury with no more or different testimony than that which is now before us. Whenever a jury is asked to declare whether a certain act or omission is "lack of care according to the circumstances"—i. e. negligent—proof of the circumstances includes proof as to what skilled men habitually do under similar circumstances, unless the occurrence at bar is so familiar to a jury of the vicinage as to need no such exposition. Injury by a vehicle to a foot passenger on a New York street crossing is an instance of such familiarity.

10 F.(2d)—4

But the present decision invites, by easy possibility, a jury of tailors and haberdashers to pass judgment on how to make a wet and rolling deck in a seaway a "safe place to work"; for there is no evidence at all as to what good seamanship, not the fears of tailors, require on such a ship at such a time. In my opinion, no case along these proper lines was made for a jury, and the result below was right.