Ralph Thomas HABERLY, a Minor, by Ralph Adam Haberly, Father, Natural Guardian and Next Friend, Respondent,

v.

The REARDON COMPANY, a Corporation, Appellant.

Ralph Adam HABERLY, Respondent,

v.

The REARDON COMPANY, a Corporation, Appellant.

Nos. 46082, 46081.

Supreme Court of Missouri,

En Banc.

Nov. 10, 1958.

Carter & Fitzsimmons, Lee M. Carter, Clayton, for (defendant) respondent-appellant.

Orville Richardson, David K. Breed, Harold M. Weber, St. Louis, for plaintiffs-respondents.

COIL, Commissioner.

The trial court ordered the above-styled cases consolidated and tried jointly. In the first, plaintiff was a 12-year-old boy (when injured) who, through his father as next friend, obtained a verdict and judgment for $15,000 as damages for personal injuries. The other was the father's action for incurred and probable future expenses and loss of companionship by reason of his son's injuries in which there was a $400 verdict. Inasmuch as all the present issues turn on the question of defendant's liability for the personal injuries suffered by the son, we shall hereinafter treat the cases as though the boy were the only plaintiff.

Defendant manufactured and sold to various distributors a product known as Bondex, a cement paint. As plaintiff's father was using Bondex, some of it got into plaintiff's right eye (under circumstances to be described) causing loss of sight. Plaintiff claims defendant was negligent in

failing to warn that Bondex contained lime or of the danger if any Bondex lodged in an eye.

Ralph A. Haberly, the father, and his family, including plaintiff, lived in Buffalo, New York. He had placed bricks at angles along the sides of his driveway so they formed rows giving a saw-tooth appearance. He desired to paint those bricks white. His wife purchased a box of Bondex at a corner store. Mr. Haberly read the directions on the box and mixed the paint, then in powder form, with water as directed. He read these words, among others: "Caution: Inasmuch as the alkalinity of Bondex may be irritating to tender or sensitive skin, it is advisable to use a paddle for mixing, and to avoid excessive or prolonged contact with the skin." He also read at another place, "Portland cement—47%; calcium oxide (hydrated) 44%—aluminum silicate, 4%—tinting materials, sealer and curing agents, total less than 5%." Those two writings on the box were the only notifications to the father (user) which defendant contends were in the nature of cautions or warnings.

Plaintiff, Ralph T. Haberly, was to prepare the bricks for painting by using a small hoe to scrape away leaves or other debris that had accumulated around them. Plaintiff, who had prepared some of the bricks for painting, was working ahead of and about three feet to the right of his father, who followed and painted the bricks with a regular paint brush. It is a fair inference that both father and son were working either on their knees or in stooped or squatting positions. The father called to the son informing him that he had missed scraping the leaves away from a particular brick and directing him to return and do so. As the father called to the boy, he rose to a standing position and, as we understand, held the paint brush in his right hand at his side and with the bristles extending to the right. The boy, apparently being then in a kneeling position, began to arise and swung or stepped to his left toward his father

and then started to go downward into a kneeling position at the site of the brick he was to clean and, in the process, his right eye ran into or came in contact with the paint brush which was then dripping with Bondex, causing a quantity of it to lodge in his eye. He experienced immediate pain. The father and mother quickly ran water into the eye. Within an estimated five to seven minutes following the accident the boy was on a hospital operating table and under the care of a doctor. The eye, however, was so burned that the sight, other than ability to distinguish between light and dark, was permanently gone.

The father, who was and had been for many years a truck driver for an oil company, had never before used Bondex and assumed that it was like any other outside white paint. He had been reared on a farm and knew what lime was and knew of its strength and, we infer, danger, but did not know that calcium oxide was lime or what calcium oxide was, and did not know what Portland cement contained lime. He said that if he had known that the Bondex contained at least 50 per cent lime, he either would not have used it or would have taken precautions to make absolutely certain that none of it came in contact with or went into anyone's eyes; that the words on the box to the effect that it might be irritating to a tender skin did not convey any warning to him that the Bondex was highly dangerous if lodged in an eye or that it would put an eye out if some of it were lodged therein for only a few minutes; that he knew that some detergents or soaps might be irritating to a tender skin and that that was the connection in which he thought of the meaning of the words of caution on the box. The father further testified that he did not intend for the boy or the boy's eye to come in contact with the paint brush and did not intend for any of the paint to get in his boy's eye, irrespective of whether the paint being used was Bondex or a relatively harmless paint or other harmless mixture. The boy testified that he did not want or intend to get anything in his eye.

It is important to here note that there was no direct evidence that the bristles of the paint brush contacted any portion of the boy's eyeball. Further, that the evidence did not show the quantity of Bondex which entered the eye and there was no evidence adduced either that the manner of the entry of or that any particular quantity of Bondex entering an eye was of decisive importance in determining what damage to the eye would ensue.

Calcium oxide is commonly known as lime, and, when chemically combined with water, forms calcium hydroxide. If water is added to calcium hydroxide the resulting solution is highly alkaline, which alkalinity is indicated by the symbol pH. The symbol pH7 indicates a neutral condition, below 7 indicates acidity, the lower the number, the greater the acidity, while above 7 indicates alkalinity progressively greater to a top of 14. The pH of calcium oxide in solution is 12½ to 13 and of Bondex in solution, 12.01. Portland cement is 50 to 60 per cent calcium oxide. The corrosive and caustic effect of lime on the eyes had been known for 50 or 100 years. The destructive changes in the eye caused by lime or by another material of high alkalinity occur within a few minutes and the chemical actions on the cornea of the eye of a concentrated solution of calcium hydroxide are irreversible. Plaintiff, as a result of the Bondex in his eye, has a scar over the cornea of the right eye, a drooping of the upper eyelid, and the right eye turns upward and doesn't track with the left.

One of plaintiff's expert witnesses said that it was not common knowledge that calcium oxide was the same as or known as lime. And defendant's executive vice-president said that he had learned only two weeks prior to trial that calcium oxide was lime.

Defendant's sole contention on appeal is that the court erred in failing to sustain its after-trial motions to set aside the respective judgments and enter judgments for defendant for the reasons that defendant was not negligent as to plaintiff and, if so, failure to warn was not a cause of the casualty. Defendant's basic contention is stated by it, "that reasonable minds could not differ in reaching the conclusion that defendant could not reasonably have anticipated the occurrence which resulted in the injury, nor could it have prevented the accident by any additional warning on its package." To support the foregoing conclusion, defendant's arguments are, we think, fairly stated as these three propositions: first, that the occurrence was not foreseeable, and that the boy's sudden movement constituted an intervening force which also was not reasonably foreseeable; secondly, there was no duty to warn about danger to the eye because anyone would or should know that if Bondex got in the eye, painful consequences would result; and third, there was no evidence from which the jury reasonably could have found that any other warning would have avoided the accident which in fact occurred.

■ As we have indicated, the accident occurred in New York and, consequently, the substantive law of that state is determinative of the issues presented. As would be expected, the parties have found no New York case (or any other, for that matter) which is factually like the instant one. Consequently, our province is to attempt to determine what the New York Court of Appeals would decide on the facts here presented. We have reached the conclusion, based upon the principles of the cases heretofore adjudicated by the New York courts and by federal courts applying New York law, that the judgments should be affirmed.

■ The aforestated facts are not in dispute. Defendant admits that the Bondex caused total blindness in plaintiff's right eye. There is likewise no dispute about the fact that, under the law of New York, the defendant had the duty to plaintiff to adequately warn plaintiff's father as the user of defendant's product of dan-

ger to plaintiff if Bondex lodged in his eye as a result of the use of it in the usual and expected manner unless that danger was known or should have been known to the father or unless the danger was patent. Of course, prerequisite to such duty to warn was the fact that defendant either had or should have had knowledge that Bondex was highly dangerous when lodged in the eyes. It is apparent, and there is no contention to the contrary, that defendant knew or in the exercise of proper care should have known the dangerous effect of Bondex upon the human eye.

Defendant first contends that it reasonably could not have anticipated that the Bondex would be put to the use to which the father was putting it, and that the injury to plaintiff did not arise out of a hazard which reasonably could have been anticipated. In so far as that contention may concern only the manner in which the Bondex was being used, it has no merit, because the Bondex was being used exactly in the manner and for the purpose intended, viz., by a householder painting the surfaces of articles such as bricks with an ordinary paint brush. But, of course, defendant means that "the product was not being put to its ordinary use when young Haberly ran against the dripping brush which his father was holding." As we understand, defendant contends both that the hazard or risk of such a thing happening was not reasonably foreseeable, and that plaintiff's sudden and unusual movement into the brush constituted an intervening act also not reasonably foreseeable.

 We cannot agree with either contention. We think the jury reasonably could have found that the defendant, as the manufacturer of Bondex for use by householders, reasonably could have anticipated that it was likely that Bondex would get into the eyes of some of those users, of some of those who would be helping users, and of some of those who would

be in the vicinity at the time the Bondex was being used. And we think a jury reasonably could have found also that defendant, under the facts of this case, reasonably could have anticipated that the hazard or risk of Bondex lodging in the eyes of those noted included a wide variety of ways, usual, unusual, unique, peculiar, and bizarre, in which paint might get into one's eye, and included the way, as in the instant case, involving an unexpected movement by a helper such as plaintiff. That must be true because, as we see it, it was not the exact manner of the occurrence (the particular freak accident, as defendant calls it) which must have been reasonably foreseeable in the judgment of a jury to inflict liability on the defendant; rather, it was the hazard or risk of Bondex by some accidental means lodging in the eye of one helping the user or otherwise in the vicinity of user.

We have said that the particular accidental way in which the paint entered plaintiff's eye under the instant facts was of no decisive import. Certainly that must be true, at least in those cases where, as here, there was no evidence that because of the manner in which the accident happened (either because the brush bristles contacted plaintiff's eyeball and thereby caused abrasions, or because of the quantity of paint which lodged in plaintiff's eye due to the manner of the accident, or both), the Bondex had a highly dangerous effect which it would not have had if it had gotten into the eye in some other manner. Stated differently, the way in which the paint got into plaintiff's eye could have nothing to do with defendant's duty to foresee the risk or hazard of paint getting into plaintiff's eye, unless the evidence showed that only by reason of the so-called freak occurrence would the Bondex have caused blindness or other serious damage. As we have pointed out, however, there was no evidence as to whether the brush bristles did come in contact with the eyeball but, more important, whether they did, there was no evidence that except for

that occurrence Bondex in the eye would not have had a tragically harmful effect on the eye.

■ The closest approach to evidence in that respect was the answer of one of plaintiff's medical witnesses to a hypothetical question to the effect that if the bristles of the brush had abraded the eyeball, the action of the Bondex would have been that much quicker, or, as the doctor phrased it, the abrasion "adds to the insult." There was no evidence whatever that only by an eye's direct contact with a paint brush (whether or not with resulting abrasions), as in the instant case or other similar occurrence, could enough or was it likely that enough Bondex would be lodged in an eye to cause blindness or other serious injury. So far as the instant evidence goes, it was just as likely that sufficient Bondex would be lodged in one's eye to cause blindness by reason of being splashed therein due to the reasonably foreseeable sloppy or inexpert handling of a paint brush by the user or in other clearly expectable accidental ways.

And so it seems to us apparent that the occurrence may be described as a freak accident or as unusual or as peculiar or as bizarre or as unique only in so far as such may be descriptive of the particular way in which the Bondex entered the eye, but that the foreseeability of risk or hazard did not require foreseeing exactly how the accident would happen. The question was whether the jury reasonably could have found that defendant, in the exercise of proper care, reasonably could and should have anticipated that unless the father was adequately warned of the danger if Bondex lodged in one's eye, there was a risk and hazard to the user and to those who were and reasonably could have been expected to have been in the vicinity of the father (including the plaintiff) because of the likelihood of such persons getting paint in their eyes, with serious and tragic consequences possibly resulting.

That such conclusion is in accord with the substantive law of New York is dem-

onstrated by the case of Pease v. Sinclair Refining Co., 2 Cir., 104 F.2d 183, 184, 123 A.L.R. 933. There, the court of appeals applied New York law to the facts. Defendant had advertised its willingness to furnish, free, certain educational materials for schools consisting of a processed oil display. Plaintiff, a teacher in the Essex, New York, high school, wrote for and defendant sent the exhibit, which purported to show "various forms of oil ranging from crude petroleum to the most highly refined products." Defendant had filled the two bottles labeled "kerosene" and "gasoline" with water (probably to retain a white color). Plaintiff had intended to perform an experiment to demonstrate that when sodium metal is combined with water it is highly explosive, and had intended to use a very small amount of his supply of sodium metal for that purpose. In order, however, to preserve the supply of sodium metal, he opened the bottle labeled "kerosene" (kerosene being a recognized preservative of sodium metal) and poured its contents onto the sodium metal. A terrific explosion occurred and plaintiff received severe burns and lost an eye. In discussing defendant's liability, the court used language which we consider peculiarly applicable to the questions we have been discussing in the instant case and demonstrates that court's view of the New York law:

"This, therefore, is one of those cases where not unusual human conduct produces results so unexpected and tragic as to startle and amaze. Yet legal precedents and human experience combine to show that bizarre accidents are far from unlikely, and recovery cannot be denied because of the uniqueness of the happenings. Usually judicial rationalization is couched largely in terms of 'foreseeability,' but it is obvious that, if it is the exact accident which must be foreseen, then recovery must regularly be denied (as it is not). * * *

"* * * If we feel the defendant at least somewhat culpable in failing to take the simple step of a warning, then we see no

reason to take the case from the jury when the consequences are serious, and, because serious, are unexpected. We think, therefore, that the issue of the defendant's negligence was properly left to the jury. * * *

"So, also, proximate cause may be found for the accident from the defendant's neglect. L. Hand, J., puts the matter succinctly in The Mars case [The Mars], D.C. S.D.N.Y., 9 F.2d 183, 184, when he states as the only intelligible line of distinction, 'What would an ordinary man expect under all the circumstances, to be the result?' and then goes on to say that not merely physical causation is sufficient, but 'there must also be some mental element. It has got to be one of those consequences which is not entirely outside the range of expectation or probability, as ordinary men view it.' But as pointed out in Tullgren v. Amoskeag Mfg. Co., 82 N.H. 268, 276, 133 A. 4, 8, 46 A.L.R. 380, 'it is not necessary that damage as a more rather than less probable result should be anticipated. * * * Danger consists in the risk of harm, as well as the likelihood of it, and a danger calling for anticipation need not be of more probable occurrence than less. If there is some probability of harm sufficiently serious that ordinary men would take precautions to avoid it, then failure so to do is negligence. * * * The test is not of the balance of probabilities, but of the existence of some probability of sufficient moment to induce action to avoid it on the part of a reasonable mind.' " 104 F.2d 185 [1], 186 [3].

New York cases which help to persuade our aforestated conclusion are Payne v. City of New York, 277 N.Y. 393, 14 N.E. 2d 449, 115 A.L.R. 1495; Bennett v. New York & Queens Electric Light & Power Co., 294 N.Y. 334, 62 N.E.2d 219; Genesee County Patrons F. R. Ass'n v. L. Sonneborn Sons, 263 N.Y. 463, 468, 189 N.E. 551, 552 [2]; Parnell v. Holland Furnace Co., 234 App.Div. 567, 570, 256 N.Y.S. 323, 326 [2, 3], 327 [4]. See also Martin v. Bengue, Inc., 25 N.J. 359, 136 A.2d 626.

Defendant, to support its position on the issues thus far discussed, relies upon only one New York case, viz., Harper v. Remington Arms Co., 156 Misc. 53, 280 N.Y.S. 862, 864. There, plaintiff was injured while hunting rabbits when a 12-gauge shell, having a much greater explosive force than ordinary commercial 12-gauge shells, exploded. Plaintiff had no knowledge that the shell he was using was of greater explosive force. He had obtained a box of shells as a gift from a friend who had, in turn, received it as a gift from an unidentified third person. Wording on the box, "Remington Proof 7.5 Tons Pressure," indicated, to those who knew the significance of the words, that they were for testing purposes only. Plaintiff did not know the significance of the words and it was his position that he should have been warned of the danger.

The court held the manufacturer was not liable because the shells were not imperfect or negligently manufactured for the purpose intended and that "The orbit of danger extended to protect only those who might reasonably have been anticipated by the normal prudent man to have been within that orbit. * * * The intrinsically dangerous nature of the shells required that notice be given by the defendant to all those who reasonably could have been anticipated to use the shells in their ordinary and expected manner of their unusual explosive force if the defendant was to comply with the necessary measure of due care required of it (Thomas v. Winchester, supra [6 N.Y. 397]; Genesee County Patrons Fire Relief Association v. L. Sonneborn Sons, supra), or circumstances must have existed which would have made the giving of such warning unnecessary. Rosebrock v. General Electric Co., 236 N.Y. 227, 140 N.E. 571." 280 N.Y.S. 867. (Bracketed insert ours.) But the court said that plaintiff there was not within the orbit of danger because he failed to show that he was a person whom the defendant might reasonably have anticipated would use those shells or that the shells were put to a use which the defendant had reason to expect they would be put.

It is apparent that the court in the Harper case applied the same principles of law to the facts there as we have applied to instant facts. That the facts in the two cases are not similar enough to consider the Harper case a factual precedent is obvious. We find nothing in that case which compels a different result than we have reached on instant facts.

Defendant relies on Hentschel v. Baby Bathinette Corp., 2 Cir., 215 F.2d 102. We note in passing that defendant describes that case as a leading New York case. While the case was decided by the court of appeals for the second circuit (which includes New York), the accident there in question occurred in the State of Michigan and federal jurisdiction was by reason of diversity of citizenship, so that Michigan law was applicable. In any event, the manufacturer and seller of a bathinette, the legs of which were made of magnesium alloy, were sued. The evidence was that when the bathinette was subjected to enough heat to cause the alloy to burn, the intensity of an existing fire would be increased and would be extremely difficult to extinguish. A fire occurred in a bathroom containing a bathinette and there was evidence indicating that plaintiff's burns were caused by the fact that the burning magnesium alloy caused the fire to burn intensely and caused bursts of blue flame to shoot out sufficiently far to reach plaintiff when she was standing in her room which was separated from the bathroom by a hallway. Two of the judges were of the opinion that because the article was not inherently dangerous in its normal or intended use, "neither its manufacturer nor vendor is liable for a result which is brought about by its subjection to unusual and extraordinary conditions." 215 F.2d 105 [2, 3]. A dissent by Circuit Judge Frank perhaps serves to point up the different concepts applicable to the factual situation there and to that in the instant case.

For our purpose, however, the important point is that the court of appeals applied the same principles and cited many of the same cases that we have applied and have cited to the facts of instant case. That the court reached a different result on those facts does not persuade us to a different result in the present case.

Defendant cites three Missouri cases, Lawson v. Benjamin Ansehl Co., Mo.App., 180 S.W.2d 751, Triplett v. Shafer, Mo. App., 300 S.W.2d 528, and Dempsey v. Virginia Dare Stores, 239 Mo.App. 355, 186 S.W.2d 217, all of which are easily distinguishable but which length limits of the opinion make it undesirable to discuss.

Defendant places perhaps chief reliance on the case of Sawyer v. Pine Oil Sales Co., 5 Cir., 155 F.2d 855. There, plaintiff purchased a bottle of a cleansing agent with statements on its label that it would not injure hands or skin and was for general household cleaning. Plaintiff alleged that she was using the product to clean a sink when some of the fluid splashed into her eye, causing permanent injury. She also alleged that defendant knew or should have known that the product contained dangerous ingredients intrinsically harmful which would cause harm when in contact with the membranes and tissues of the body in the ordinary course of use and that defendant should have anticipated such contacts in the ordinary course of use.

The court of appeals for the 5th circuit affirmed an order dismissing the complaint on the ground that plaintiff was fully aware that the preparation was not intended for use in the eye, and that if splashed sufficiently it would be caused to splash upon her, and "that persons in the general use of benzene, household ammonia, lysol, nap[h]tha, and other similar agents, are aware of the fact that painful consequences will result if they are used in such manner as to allow them to get into the eye, but these potential consequences do not result in a discontinuance of their use nor in the conclusion that they are unfit for the use to which they are intended to be put." 155 F.2d 856.

We agree that the case last cited supports defendant's present theory and is generally contrary to the theory of the conclusion we have reached. We think the result in Sawyer v. Pine Oil Sales Co., supra, is wrong and not in accord with New York law.

◼ Defendant next contends that any hazard from the use of Bondex due to its high alkalinity was patent because it was labeled "cement paint" and the father knew or should have known that cement paint contained lime which would be dangerous to eyes; and further, that the words of caution themselves sufficiently apprised the father of the danger because anyone would know that a substance which would irritate skin would be harmful to eyes.

As has been noted, the only warning on the box was, "Caution: Inasmuch as the alkalinity of Bondex may be irritating to tender or sensitive skin, it is advisable to use a paddle for mixing, and to avoid excessive or prolonged contact with the skin." We think a jury reasonably could have found that there was nothing in the foregoing language which would cause an ordinarily intelligent person to believe that the product Bondex was such that a small quantity of it lodged in an eye could cause almost immediate blindness. On the contrary, a jury reasonably could have found that the language used was in the nature of an assurance that the *only* danger in the use of Bondex was that it might have a slightly irritating effect upon a tender skin after prolonged contact.

Further, the words "cement paint" do not necessarily indicate to the average person that the paint was made of cement. They may mean that the paint was to be used to cover cement and other similar surfaces. It is true, however, that, as heretofore noted, the box contained the information that a 47 per cent ingredient of Bondex was Portland cement. The father testified that he did not know cement contained lime. That testimony, together with the misleading effect (if the jury so found) of the

warning on the box, constituted substantial evidence from which a jury reasonably could have found that notice to the father that one of the ingredients was Portland cement was not tantamount to a notice that the product contained a large amount of lime or of the highly dangerous character of the product when some of it lodged in an eye.

◼ Likewise, we cannot agree that this court should hold, as a matter of law, that Bondex, when mixed with water according to directions and changed into a liquid paint, was of itself the kind of material in appearance which anyone would know would have so harmful an effect if lodged in an eye as to cause serious injury, including almost instantaneous blindness. And that is true, even though it may be conceded, as defendant contends, that anyone would, or in the exercise of commensurate care should, know that paint of any kind getting into an eye would probably cause some painful consequences and that anyone exercising commensurate care would try to avoid getting paint into his eye.

◼ It is certainly common knowledge and it is certainly true that foreign substances, unless specifically so directed by a doctor, should not be lodged in an eye. Care should be exercised in an attempt to see to it that no foreign substances enter an eye, because everyone knows that, generally speaking, a foreign substance in an eye—whatever it may be—sometimes will result in pain and some painful and possibly serious consequences. It does not follow, however, from the fact that such is common knowledge that a specific warning directing attention to the tragic consequences (as in the instant case) which may occur if Bondex is lodged in an eye, would not alert one to act far differently than otherwise he would have acted, and to take action far beyond any he would have taken to effect his general desire, to keep paint and other foreign substance away from and out of the eyes.

■ Furthermore, defendant's own evidence was that subsequent to the instant occurrence and prior to trial the warning on Bondex packages had been changed by the addition of the words, "Care should be taken to avoid contact with the eyes." Without pausing to consider the adequacy of such new warning or to consider the full effect of the fact of the change, we are of the opinion that such evidence, at the very least, was evidence . which, together with the other evidence in the case, was sufficient to require the jury to determine the necessity for and the adequacy of the warning under the facts of the instant case.

That our conclusion that the necessity for and adequacy of the warning in this case should be decided by a jury would be the view of the New York courts is attested by Pease v. Sinclair Refining Co., supra, 104 F.2d 186 [3]; Henry v. Crook, 202 App.Div. 19, 195 N.Y.S. 642; Rosebrock v. General Electric Co., 236 N.Y. 227, 140 N.E. 571, 574 [2–4]; Moss v. Fred Perlberg, Inc., Sup., 29 N.Y.S.2d 922. See also Maize v. Atlantic Refining Co., 352 Pa. 51, 55, 41 A.2d 850, 852 [4, 5], 160 A.L.R. 449; Hardy v. Proctor & Gamble Mfg. Co., 5 Cir., 209 F.2d 124; Harper & James, The Law of Torts, Vol. 2, § 28.7, p. 1547; 41 Va.L.Rev. 145, 160.

Defendant's final proposition is that even if it negligently failed to adequately warn there was no evidence from which the jury reasonably could have found that such failure was a cause of the accident. Defendant's contention is that under the evidence the father's knowledge or lack of knowledge of the ingredients or danger of Bondex did not in any way cause the accident. In other words, the accident would have occurred irrespective of what warning was on the Bondex box or might otherwise have been given to the father.

■ As we have noted, the father testified that had he been warned, in effect, that Bondex was highly dangerous when lodged in an eye and could cause almost immediate loss of sight, he would either not have used it at all or would have in some manner made certain in his use of it that the Bondex did not come in contact with anyone's eyes. Now a jury might not have given such testimony any weight, because it is usual and easy for an actor to say after the fact that if he had known such and such, he would have done so and so, and thus and thereby have avoided the casualty. The testimony, however, was evidence which the jury could have chosen to consider as substantial and as tending to prove that the failure to warn was in fact a cause which contributed to the loss of plaintiff's eye.

It is true that one or a jury could not certainly arrive at a conclusion that plaintiff's father, if adequately warned of the tragic consequences of Bondex lodging in the eye of his son, would have so acted that the instant accident would not have occurred. Always there must be present the element of forecasting what the father's or another's conduct would have been under supposed circumstances.

The language of Judge Learned Hand in Zinnel v. United States Shipping Board Emergency Fleet Corp., 2 Cir., 10 F.2d 47, 49, a case in which the negligence relied on was the failure to provide a guard rope in a certain position on board a vessel, is apropos: "There of course remains the question whether they might have also said that the fault caused the loss. About that we agree no certain conclusion was possible. Nobody could, in the nature of things, be sure that the intestate would have seized the rope, or, if he had not, that it would have stopped his body. But we are not dealing with a criminal case, nor are we justified, where certainty is impossible, in insisting upon it. We cannot say that there was no likelihood that a rope three feet above the deck made by the timber would not have saved the seaman."

■ We should not say as a matter of law that there was no likelihood that a dif-

ferent warning, one calculated to alert the father to the great danger of Bondex to one's eyes, would not have avoided the accident. On questions of causation, if certainty is to be required, it is the jury, not the court, which must insist upon it.

And we do not agree that, because the father was bound to use care to avoid getting paint in his son's eye, irrespective of the kind of paint and irrespective of the circumstances, it follows that the occurrence would have happened in any event because the boy's movement into the brush would have occurred just the same. An illustration may demonstrate the fallacy of such reasoning. It is common knowledge that it is a natural proclivity of children to insist upon being in close proximity to a father when he is performing tasks such as painting. It should be conceded that a father, while painting, would exercise great care to keep the paint off the child's clothes, away from his skin, and certainly out of his eyes. If the paint got on the child's clothes, they would be ruined or would have to be cleaned; if the paint got on the child's skin, the skin might be irritated and would have to be cleaned with turpentine or some other substance; and the father would, in all events, try to keep the paint away from the child's eyes because he would know that otherwise injurious consequences might ensue and that the child might require medical attention. But to say it follows, as a matter of law, that simply because a father would always be required to exercise care, even great care, to keep paint out of a child's eyes, means that a father's preventive measures would have been no different if he had been warned that if a blob of paint lodged in his child's eye it might mean immediate blindness, is to disregard the realities of the situation. The common-sense answer to defendant's argument is that given an *adequate* warning, a father either would not use Bondex or would make as certain as humanly possible that no Bondex would enter anyone's eyes.

We have no doubt that it was for a jury to decide whether, but for defendant's failure to adequately warn, plaintiff's injury would not have occurred. The cases here cited indicate that our conclusion is in accord with the law of New York. Howard Stores Corp. v. Pope, 1 N.Y.2d 110, 150 N.Y.S.2d 792, 134 N.E.2d 63; Ward v. Consolidated Iron & Metal Co., Inc., 275 App.Div. 857, 89 N.Y.S. 88; Bennett v. N. Y. & Queens Electric Light & Power Co., supra, 62 N.E.2d 219; O'Neill v. City of Port Jervis, 253 N.Y. 423, 434, 171 N.E. 694, 698. See also Martin v. Bengue, Inc., supra, 136 A.2d 634 [9, 10]; Harper & James, The Law of Torts, Vol. 2, § 20.2, p. 1110 et seq., and see again Hardy v. Proctor & Gamble Mfg. Co., supra, 209 F.2d 131 [2].

To support its position that the failure to warn was not the cause of the accident, defendant relies on two New York cases. In Bloom v. Gimbel Bros. Inc., Sup., 147 N.Y.S.2d 843, plaintiff bought a liquid floor polish which ignited when being used in his apartment. He sued the seller and the manufacturer. The New York City Administrative Code, § C19–59.0 required containers of inflammable products to be labeled, "CAUTION—INFLAMMABLE MIXTURE. DO NOT USE NEAR FIRE OR FLAME." The label on the floor polish container actually read, "Caution. Inflammable Mixture. Keep Away From Open Flame." The court denied recovery and held that the manufacturer was in substantial compliance with the requirement of the Code and, in any event, the slight variation in wording and in the fact that the caution was not in capital letters was not the cause of the accident, because the evidence showed that plaintiff was aware of the need for cross ventilation and the exact cause of the combustion was not established. Clearly that case does not support defendant's position.

In Gralton v. Oliver, 277 App.Div. 449, 101 N.Y.S.2d 109, defendant's automobile skidded into the rear bumper of a stopped

car, the bumpers locked, and plaintiff, a passenger in defendant's automobile, voluntarily disengaged the bumpers. After he had finished and while he was still standing between the automobiles, a third car, driven by codefendant, ran into the rear of defendant's car causing it to collide with and injure plaintiff.

Plaintiff sued the driver of the car in which he was riding (defendant) and the driver of the automobile which collided with the car in which he was riding. The court held that the negligence, if any, of the defendant was a remote and not a proximate cause of plaintiff's injury and that defendant reasonably could not have anticipated that his negligence in sliding into the car ahead of him would produce subsequent harm to plaintiff. Irrespective of what we may think of the result in that case on the facts presented, we are of the opinion that it has no decisive applicability to the instant factual situation.

Defendant also relies on four Missouri cases, viz., Tayer v. York Ice Machinery Corp., 342 Mo. 912, 119 S.W.2d 240, 117 A.L.R. 1414; McClaren v. G. S. Robins & Co., 349 Mo. 653, 162 S.W.2d 856; Dempsey v. Virginia Dare Stores, supra, and Smith v. Mabrey, 348 Mo. 644, 154 S.W.2d 770. Again, we have examined those cases and we are of the opinion that they are easily distinguishable. Both for the reason that they are Missouri cases and thus, in no event, controlling, and because this opinion already is too long, we refrain from a discussion of them.

The judgment in each case is affirmed.

## PER CURIAM.

The foregoing opinion by COIL, C., is adopted as the opinion of the court en Banc.

HOLLINGSWORTH, C. J., and WESTHUES, EAGER and DALTON, JJ., concur.

STORCKMAN and LEEDY, JJ., dissent.

HYDE, J., dissents in separate opinion filed.

HYDE, Judge (dissenting).

I respectfully dissent from the opinion of COIL, C., herein, because I think the negligence of plaintiff and his father was the sole cause of plaintiff's injury. I do not think the directions and statement of contents on the box of paint had anything to do with plaintiff's father putting paint in plaintiff's eye. Plaintiff's father knew it would be harmful to put any kind of paint in plaintiff's eye and he was not intending to use this paint for any such purpose. He did not put this paint in plaintiff's eye because of anything in the directions or statement of contents; instead it got in plaintiff's eye by his carelessness in handling the paint brush and carelessness in the way plaintiff and his father were working.

A manufacturer is subject to liability for bodily harm caused by the use of his product, in the manner and for the purpose for which it is supplied, if he fails to exercise reasonable care to give the user information which he has and which he should realize would be necessary to make such use safe. (Restatement of Torts, Sec. 394, Sec. 388 and 388 comment g.) However, it is my view, that this liability should not be extended to make a manufacturer liable for negligence of users in the way they use his product and it seems to me that this would have to be done to impose liability in this case. In other words, my view is that, while a manufacturer may be liable for injuries caused by the use of his product in the manner and for the purpose for which it is supplied, he is not liable for negligence of those who use it. In short, he warrants the safety of his product for its intended use but does not warrant that all users will act without negligence in using it.

I would reverse these judgments.