Dale Pitts, a Minor, by Evelyn Pitts, His Mother and Next Friend, Plaintiff-Appellant, v. Joseph Basile and Salvatore Inzerillo, Ambrose Maiers, d/b/a Pacific Toy House, Defendants-Appellees.

Gen. No. 49,299.

First District, Fourth Division.

January 13, 1965.

Rehearing denied January 27, 1965.

John C. Mullen, of Chicago (James P. Chapman, of counsel), for appellant.

Ross, Kralovec, Sweeney & Marquard, of Chicago (Henry J. Marquard and Edward V. Scoby, of counsel), for Ambrose Maiers, d/b/a Pacific Toy House, appellee.

MR. JUSTICE DRUCKER delivered the opinion of the court.

A verdict and judgment for $50,000 were entered in this negligence action against all defendants after a jury trial. The motion of Ambrose Maiers, d/b/a Pacific Toy House (hereinafter referred to as defendant), for judgment notwithstanding the verdict was allowed and plaintiff filed this appeal. Defendants Basile and Inzerillo, joint owners of the IGA Store, did not file post-trial motions and are not involved in the instant appeal.

On September 14, 1954, Lonnie Phillips, eight years old, went to the IGA Store at Newland and Grand Avenues in Chicago to obtain some darts.[1] He testified:

> When I went into the store to get the dart, the dart was too high for me to reach. There was a man standing next to me. He walked up to me and said, "Can I help you?" I said, "I'd like that package up there." So, he took them down and asked if I had any money. I said, yes, and gave him twenty cents. He handed me the darts. . . .

[1] Each dart was approximately 6½ inches from the steel point to the multi-feathered top. The wooden shaft was about 4¾ inches, the steel point about 1½ inches. The package was about 7½ inches by 3½ inches, it consisted of two darts and a miniature circular dart board. The background color was yellow. The header had the following: "KIDDY TOY-PAK, Price 19¢." In still larger letters "SKILL DART GAME" was printed across the bottom of the package.

> There were no instructions as to the use of the dart contained in the package or anywhere connected with the package or on the dart.

The following day at about 5:00 p. m. the eight-year-old was throwing the darts toward the garage behind his home. Phillips acknowledged that one dart "rolled off my hand and struck Dale Pitts in the eye. He was about 5 to 10 feet off of my right hand at that time." Dale Pitts, aged six, said that just prior to the incident somebody had exclaimed, "Look out"; that he turned around and that the next thing he knew he was hit in the left eye by a dart. The damage to plaintiff's eye was described in his testimony and that of his physician, Dr. James Walsh. Dale Pitts claimed that he could perceive occasional light and darkness with his left eye; that he sometimes felt "a little pain in my left eye" after reading one to two hours.

Dr. Walsh stated that a cataract formed over the eye; that the eye had turned or crossed about 30 degrees; that the eye was out of focus; and that plaintiff was unable to use the central vision of his injured eye. The doctor opined that "this condition is permanent and directly related to the initial injury to the eye as a result of the dart penetration."

Defendant supplied the IGA Store with the packaged darts. He referred to his enterprise as that of "rack distributors . . . primarily a service operation whereby we take specific items and display them in a store for sale to the public." In 1954 the darts were "packaged in cellophane bags with a header attached to them so that they could be hung on hooks for display." Defendant further testified that the package, labeled "KIDDY TOY-PAK," was "something for a child, as a toy" and that such a rack display might prompt "impulse sales." On cross-examination he stated that prior to September 15, 1954, he did not instruct his salesmen "to warn or

instruct the dealers or retailers not to sell this dart or darts to children."

Salvatore Inzerillo testified that his store stocked dart packages labelled "KIDDY TOY-PAK" in addition to 60 other items [2] supplied by defendant. He denied selling darts to Lonnie Phillips and Dale Pitts. His partner Basile "had nothing to do with the sale of darts." The cashier at the store on or about September 15, 1954, could not remember selling darts to Lonnie Phillips, or for that matter, selling any packaged darts whatsoever.

Plaintiff's appeal postulates the theory that the evidence, taken in the light most favorable to the plaintiff, demonstrated that defendant was guilty of actionable negligence towards the plaintiff and that the judgment notwithstanding the verdict should not have been granted. He argues:

1. That the supplier of toys, specifically designed and oriented to children, owed a duty (a) to exercise reasonable care in supplying toys which could be safely used by children for their designated purpose, or (b) to supply adequate warning as to the danger attending their indicated use.

2. That there was sufficient evidence to support a finding that defendant violated such duty.

3. That the issues on review of a judgment notwithstanding the verdict are whether there is a cause of action stated and whether there is any evidence tending to support the jury's verdict for the plaintiff, and that plaintiff has met both issues.

Defendant contended that he was not liable to a person with whom he was not in privity of contract because the dart was neither defective nor inherently dangerous. In the alternative defendant advanced the

---

[2] Defendant testified: "We handle all types of toys, games, hobby kits, puzzles and any item for amusement, education or intrigue." The list includes dolls, puzzles, cars, trucks and play money.

argument that his sale of the darts to the IGA Store was not the proximate cause of the injury to the plaintiff.

Plaintiff relies on Kahn v. James Burton Co., 5 Ill 2d 614, at page 622, 126 NE2d 836:

> Every person owes to all others a duty to exercise ordinary care to guard against injury which may naturally flow as a reasonably probable and foreseeable consequence of his act, and the law is presumed to furnish a remedy for the redress of every wrong. The duty to exercise ordinary care to avoid injury to another does not depend upon contract, privity of interest, or the proximity of relationship, but extends to remote and unknown persons. (Wintersteen v. National Cooperage and Woodenware Co., 361 Ill 95.) The test in the case at bar is whether the lumber company in the exercise of ordinary care could reasonably have anticipated the likelihood that children would climb onto the lumber and would be injured if it were not securely piled.

In that case a lumber company was the supplier; it neither owned nor controlled the land on which it piled an order of lumber. The court said these factors did not absolve the supplier from liability for the consequences of its own negligence.

The dart need not be classified as a dangerous instrumentality in order to hold the defendant liable. Smith v. Springman Lumber Co., 41 Ill App2d 403, 191 NE2d 256. In Smith plaintiff-minor lived with his family in a dwelling owned by defendant. A fuel tank which was no longer in use was situated next to a tree on defendant's premises; it rested on concrete blocks, was old and rusty but without physical defects. Plaintiff ". . . while standing on the tank or attempting to climb into the tree slipped and fell to the

ground causing injury . . ." One of defendant's contentions in that case was that common instrumentalities in common use were not in themselves dangerous objects. The court did not ascertain whether the tank itself was a dangerous instrumentality. It predicated its opinion concerning the liability on Kahn, asserting that the test is "the foreseeability of harm to the child. . . . [which] were matters for the determination of the jury." The court enumerated factors which justified the jury's verdict for plaintiff. These considerations were: defendant's knowledge of the children playing on the tank, the probability of their injury, their tender years, their incapability of appreciating the risk involved, and finally, the small cost involved in remedying the danger. In the instant case, whether or not defendant had knowledge that the IGA Store might sell the "KIDDY TOY-PAK" to small children; the probability of injury; Lonnie Phillips' age; incapacity to appreciate the risk associated with the product, and the cost to remedy the danger (by warning or instruction) were questions for the jury's consideration. The principles of Kahn have been recognized in a variety of cases other than those involving injury to children on property: Morgan v. Mixon Motor Co., 10 Ill App2d 323, 137 NE2d 504 (defective automobile brakes); Bezark v. Kostner Manor, Inc., 29 Ill App2d 106, 172 NE2d 424 (nursing home's liability for assault by patient); Leatherman v. Schueler Bros., Inc., 40 Ill App2d 56, 189 NE 2d 10 (liability of contractor to person lawfully on premises).

A leading compendium of cases dealing with product liability recognizes that an item need not be termed inherently dangerous in order to predicate liability on a manufacturer not in privity with the consumer-user. As stated in 1 Frumer and Friedman, Products Liability, § 5.03:

> . . . [L]iability no longer turns on the inherent harmfulness of a particular product. The terms "inherently dangerous" and/or "imminently dangerous" are still sometimes used by courts . . . but this does not imply that the article must at all times be "inherently" or "imminently" dangerous. Thus, liability has been sustained or potentially recognized to persons not in privity with the manufacturer in cases involving such ordinarily harmless products as: refrigerators . . . shoe dye . . . lounge chair. . . .

The problem of foreseeability of risk is developed by Noel, "Manufacturer's Negligence of Design or Directions For Use of a Product," 71 Yale Law Journal 816 at 855:

> A particularly important area involves the duty of manufacturers to foresee intervening acts of others. While there is no obligation to anticipate abnormal uses of a product, the abnormality of a particular use may be a close question. Moreover, there ordinarily is no duty to anticipate careless use, but where the use is by a person not familiar with the dangers of the product, the matter of foreseeability of the use may be a question for the jury.

Further support for sending that issue of negligence to the jury is found in the labelling of the dart package "KIDDY TOY-PAK." This language can be viewed as an indirect representation of safety. Words of this nature tend to prevent recognition of a danger which otherwise would be obvious. In Crist v. Art Metal Works, 230 App Div 114, 243 NYS 496, affirmed 255 NY 624,[3] a toy gun which discharged

[3] An infant was injured while dressed during the Christmas season in a Santa Claus costume when the flame emanating from

sparks was heralded in advertising literature as a toy which was "absolutely harmless" for use by children. The court held that the advertising material might induce its use in "such manner as to make an otherwise harmless article a source of danger," and that where a manufacturer markets the product with "sweeping and unqualified representation that a child could not be hurt by it" the plaintiff is entitled to go to the jury on the issue of negligence.[4]

Victory Sparkler & Specialty Co. v. Latimer, 53 F 2d 3, has several legal and factual parallels to the instant case. The article in Victory was a firework, designated a "spit devil." It was one inch in diameter and one-eighth inch thick. The "spit devil" would ignite, burn or explode when subjected to a blow or friction. The composition was poisonous if ingested by humans. The "spit devil" was wrapped in plain red paper without any poison label or warning. Plaintiffs sued the defendant manufacturer for the damages occasioned by the death of their three and one-half-year-old son who consumed one of the "spit devils" which he had purchased from a retailer.[5]

Plaintiffs recovered a judgment below and the decision was affirmed on appeal. The court, at page 5, said:

> These poisonous articles were shaped like a lozenge, wrapped in plain red tissue paper, and, in view of their appearance, size, and character . . . [the] jury . . . was warranted in finding

the barrel of the toy pistol ignited the whiskers and soft cotton material which formed part of the costume.

[4] Also see the recent article by Page Keeton, "Products Liability-Current Developments," in 40 Texas Law Review 193.

[5] The evidence disclosed that other children had ingested "spit devils" and that defendant's officers "admitted knowledge of at least two such instances, both resulting in death."

> that in the case of children they were attractive to taste. One who deals with children must anticipate the ordinary behavior of children, . . . in considering whether or not the defendant was negligent in placing these articles in the channels of trade, it must be remembered that they were intended for the use and amusement of children, as well as others. In the hands of children they were imminently dangerous and the injury might reasonably have been anticipated.

There was no warning on the article; there was a controversy as to whether the cartons in which the "spit devils" were shipped had warning labels.

We are faced with a product which we do not term "inherently dangerous" but which has been labelled, packaged and merchandised with compelling attractiveness to children of Lonnie Phillips' age, children who might not appreciate its danger but who have been drawn or impelled into their purchase because of the environment in which the darts had been placed. At one end of the product were multi-colored feathers. The other end was tipped with a one and one-half-inch steel point. The darts were attached to a bright yellow cardboard. The cardboard had a printed miniature circular target and in bold letters was inscribed SKILL DART GAME. The package was covered with transparent paper and had a header to allow it to be placed on a rack display. The header stated that the item was a "KIDDY TOY-PAK." Other products including puzzles, cars, hobby kits, toys, paper money, were on the same rack which was placed on a freezer in a neighborhood grocery store. Defendant testified that the toy package was "something for a child, as a toy"; that his salesmen were not instructed to warn retailers not to sell darts to children; and that a rack display might create "im-

pulse sales." Lonnie Phillips testified that no instructions or warnings about the darts' use were given to him or were to be found on the package. He further testified that he had never before used darts.

Noel, referring to 2 Harper and James § 28.6, asserts at page 858 that whenever the foreseeability of the abnormal use is doubtful "it will be a question for the jury whether the maker should have anticipated it." Instructive in this respect is Haberly v. Reardon Co., 319 SW2d 859, in which a minor was permanently blinded in one eye when cement base paint accidently lodged in his eye while he was helping his father paint. The Supreme Court of Missouri held jury questions were presented as to whether the manufacturer of paint could reasonably have anticipated that it was likely to get into the eyes of users or their assistants and as to whether the manufacturer in the exercise of reasonable care should have adequately warned of the danger of having paint lodged in one's eye. The court maintained at page 867:

> Likewise, we cannot agree that this court should hold, as a matter of law, that Bondex, when mixed with water according to directions and changed into a liquid paint, was of itself the kind of material in appearance which anyone would know would have so harmful an effect if lodged in an eye as to cause serious injury, including almost instantaneous blindness. And that is true, even though it may be conceded as defendant contends, that anyone would, or in the exercise of commensurate care should, know that paint of any kind getting into an eye would probably cause some painful consequences and that anyone exercising commensurate care would try to avoid getting paint into his eye.

> It is certainly common knowledge and it is certainly true that foreign substances, unless specifically so directed by a doctor, should not be lodged in an eye. Care should be exercised in an attempt to see to it that no foreign substances enter an eye, because everyone knows that, generally speaking, a foreign substance in an eye—whatever it may be—sometimes will result in pain and some painful and possibly serious consequences. It does not follow, however, from the fact that such is common knowledge that a specific warning directing attention to the tragic consequences (as in the instant case) which may occur if Bondex is lodged in an eye, would not alert one to act far differently than otherwise he would have acted, and to take action far beyond any he would have taken to effect his general desire, to keep paint and other foreign substance away from and out of the eyes.

In the instant case it was a question of fact whether or not the obviousness of the danger would have been appreciated by Lonnie Phillips.

Defendant's second contention is that there were two instances where independent and competent human agencies came into possession and control of the darts between the sale by defendant and the use by Lonnie Phillips and that as a consequence defendant should have been absolved of liability for the harm.

One of these instances, defendant claims, arose by virtue of the testimony of Phillips' mother that her sister-in-law (Lonnie's aunt) told her "she had taken darts away from my son before the accident." Lonnie Phillips, on cross-examination, was asked: "Now, I am referring now to the night before the occurrence. Did anyone in your house see you with the darts?" Phillips' reply was that "I'm

sorry, I can't remember." He was further questioned: "Do you remember whether anyone in your house took these darts—that night—took the darts away from you?" The witness maintained that "Nobody took them away from me." He was also asked whether his aunt had seen him with the darts the night before the accident and taken them from the eight-year-old. His response was: "No, sir, not as far as I know." This presented an issue of fact for the jury.

The other instance is defendant's claim that its sale of the darts to the IGA Store is too remote to be termed the proximate cause of the injury.

The issue of intervening causes is discussed in Stewart v. DuPlessis, 42 Ill App2d 192, 198, 191 NE2d 622:

> However, "the intervention of independent concurrent or intervening forces will not break causal connection [between the original wrong and the injury] if the intervention of such forces was, itself, probable or foreseeable." . . . The test to be applied is whether the first wrongdoer might reasonably anticipate the intervening cause as a natural and probable consequence of his own negligence. . . . Whether the act of plaintiff's companion was, in itself, probable or foreseeable, is, on the record before us, a question for the jury.

Defendant attempts to distinguish that case on the ground that the defendant in the Stewart case was one step closer to the injury since that plaintiff was struck in the eye by lime thrown by other children. The lime had been left by defendant-contractor on the work site at the end of the work day.

The question of proximate cause does not necessarily rest solely on "steps" or the proximity of relationship. As the court in Stewart indicated, it

was a jury question as to whether or not defendant should reasonably have foreseen the likelihood or probability of such an act. It further stressed that "intervening forces" will not break a causal connection. (See also Ney v. Yellow Cab Co., 2 Ill2d 74, 79, 84, 117 NE2d 74.) In the instant case it was a question for the jury to resolve whether or not there had been adult intervention by the IGA sale to Phillips or by the aunt between the time of sale by defendant to the IGA Store and the injury. If so, it was also a jury question as to whether such intervention was reasonably foreseeable.

The role of a reviewing court relating to a trial court's ruling on a motion to enter a judgment notwithstanding the verdict of a jury is set forth in Day v. Barber-Colman Co., 10 Ill App2d 494 at page 502, 135 NE2d 231:

> We are confronted at the outset with the question as to whether there is any competent evidence, standing alone, together with any reasonable inferences to be drawn therefrom, taken with its intendments most favorable to the plaintiff, to support the charge that the defendant was negligent in the design or manufacture of the door, or to prove the other material elements of the plaintiff's case. If not, the defendant's motion for judgment notwithstanding the verdict was properly allowed: Lindroth v. Walgreen Co. (1950) 407 Ill 121. Upon such a motion we can consider only the competent evidence: Hunter v. Troup (1924) 315 Ill 293. Evidence that has no probative force, whether objected to or not, cannot be considered: Knudson v. Knudson (1943) 382 Ill 492. Evidence sufficient to defeat such a motion must be evidence upon which the jury could, without acting unreasonably in the eyes of

the law, decide in favor of the plaintiff: American Nat. Bank v. Woolard (1930) 342 Ill 148; Provenzano v. Illinois Cent. R. Co. (1934) 357 Ill 192.

■ ■ Under the evidence in this case, we find that there was a duty on the defendant to exercise reasonable care in the marketing of his toy product and that there was competent evidence to support the charge that defendant was negligent.

The judgment notwithstanding the verdict in favor of the defendant is reversed and the cause remanded with directions to vacate the judgment notwithstanding the verdict and to enter judgment on the verdict for plaintiff.

Reversed and remanded with directions.

McCORMICK, P. J. and ENGLISH, J., concur.